**Robert G. PITMAN, Jr.,**
v.
**The UNITED STATES.**
No. 212–70.

United States Court of Claims.
April 14, 1972.

E. L. Koepenick, Bethesda, Md., Atty. of Record, for plaintiff.

Arthur D. Smith, Washington, D. C., with whom was Asst. Atty. Gen. Kent Frizzell, for defendant.

Before COWEN, Chief Judge, DURFEE, Senior Judge, and DAVIS, COLLINS, SKELTON, NICHOLS and KUNZIG, Judges.

ON DEFENDANT'S AND PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT

COWEN, Chief Judge.

Plaintiff brought this action pursuant to the Fifth Amendment and the Tucker Act to recover just compensation for the taking of 4 acres of beachfront property in Brevard County, Florida, which plaintiff acquired in 1956.

Plaintiff claims that the damage suffered by him resulted from the construction and operation of the Canaveral Harbor Project. The project was designed to provide a deepwater harbor on the east coast of Florida in Brevard County, immediately south of Cape Kennedy, formerly Cape Canaveral, and was

authorized by Congress in the Rivers and Harbors Act, 59 Stat. 10, 16 (1945). The project extends from deep water in the Atlantic Ocean westward through the eastern Florida shore to the Intracoastal Waterway. The barrier beach from which Cape Kennedy extends is separated from the Florida mainland by two shallow tidal lagoons, the Banana and Indian Rivers. Canaveral Harbor lies against the recurving shore just south of the Cape and for many years had provided a natural shelter against winds and storms. The project consists of a turning basin, about 35 feet deep, located near the eastern shore of the Banana River and enclosed by a dike, and an entrance channel approximately 36 feet deep and 400 feet wide, extending from the turning basin eastward to deep water in the Canaveral Bight. The entrance channel is protected at its seaward entrance by two jetties. The project also includes a barge canal, approximately 6 miles long, extending from the turning basin to the Intracoastal Waterway.

Prior to the beginning of work on the project in 1950, the shoreline in the vicinity of Canaveral Harbor was accreting because of a large amount of southerly littoral drift which provided nourishment for the beach. However, after work began on the project and particularly after the construction of two jetties at the entrance channel, the shoreline immediately south of the entrance channel has receded, while the shoreline north of the channel has continued to advance. The south jetty was completed in November 1953 and the north jetty in September 1954.

Plaintiff's property lies south of and near the entrance channel to the Canaveral Harbor Project. The beach had been receding for about 3 years before plaintiff acquired the property. The erosion continued at an accelerated rate during the succeeding 8 or 9 years. As a result, approximately 300 feet of plaintiff's beach property was lost. By 1964 the erosion had reached a point within about 50 feet of plaintiff's dwelling house. In order to protect the house he constructed, at considerable expense, a seawall and a groin.

In the course of constructing or maintaining the project, the Corps of Engineers has never entered upon or directly invaded plaintiff's property. All of the project construction and maintenance were performed below the highwater line of the Atlantic Ocean waters, or upon land owned by the United States or subject to easements acquired by it.

From the foregoing it will be seen that the essence of plaintiff's claim is that the project, which was authorized by Congress in aid of navigation, has interrupted the southerly littoral drift and that the resulting erosion has caused the loss of about 4 acres of his beachfront property. Therefore, his right to recover requires a showing that he had a property right in the uninterrupted and natural flow of the Atlantic Ocean. Upon the facts which are undisputed or assumed to be proven, we conclude that the damage sustained by plaintiff does not constitute a compensable taking within the purview of the Fifth Amendment.

The plenary power of the Government in the navigable waters of the United States for the purpose of regulating and improving navigation is so firmly established that it has become axiomatic. As early as 1876, the Supreme Court declared that Congress has the power

> to order obstructions to be placed in the navigable waters of the United States, either to assist navigation or to change its direction by forcing it into one channel of a river rather than the other. It may build lighthouses in the bed of the stream. It may construct jetties. South Carolina v. Georgia, et al., 93 U.S. 4, 11–12, 23 L.Ed. 782 (1876).

The paramount interest of the United States in the flow of a navigable stream

originates in the Commerce Clause of the Constitution and has often been referred to as a dominant servitude. United States v. Commodore Park, 324 U.S. 386, 65 S.Ct. 803, 89 L.Ed. 1017 (1945). In speaking of this dominant servitude, the Supreme Court held that riparian or littoral owners have no vested rights in the flow of navigable waters as against the Government.

The Federal Government has domination over the water power inherent in the flowing stream. It is liable to no one for its use or non-use. The flow of a navigable stream is in no sense private property; * * *. United States v. Appalachian Electric Power Co., 311 U.S. 377, 424, 61 S.Ct. 291, 85 L.Ed. 243 (1940).

Thus, while a riparian owner has a right to have navigable waters come to him unchanged in their natural condition as against other riparian owners, he has no such right against the paramount power of the United States to improve navigation. W. A. Ross Const. Co. v. Yearsley, 103 F.2d 589 (8th Cir. 1939) aff'd 309 U.S. 18, 60 S. Ct. 413, 84 L.Ed. 554 (1940); Franklin v. United States, 101 F.2d 459 (6th Cir. 1939); aff'd 308 U.S. 516, 60 S.Ct. 170, 84 L.Ed. 439. Upon facts which are so similar that they control the result in this case, this court reached the same conclusion in Southern Pacific Co. v. United States, 58 Ct.Cl. 428 (1923); aff'd 266 U.S. 586, 45 S.Ct. 124, 69 L. Ed. 454 (1924) and Tennessee Gas Transmission Company v. United States, 173 Ct.Cl. 1180 (1965), cert. den. 383 U. S. 943, 86 S.Ct. 1197, 16 L.Ed.2d 207 (1966).

Plaintiff has not alleged and acknowledges that he cannot prove that defendant raised the level of the Atlantic Ocean above the high-water mark so that the ocean has permanently inundated his land and caused the damage complained of. For this reason plaintiff's reliance on Coates v. United States, 93

F.Supp. 637, 117 Ct.Cl. 795 (1950), is unfounded. The court's holding there was based upon the finding that the Government's actions had raised the Missouri River above its ordinary high-water mark and directly caused the destruction of the plaintiffs' land. For the same reason the decision in United States v. Cress, 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746 (1917), upon which plaintiff also relies, is inapposite.

It is established in this case that no entry was made upon the plaintiff's land by the Corps of Engineers in the course of the construction or maintenance of the project. This, together with other facts stated above, shows that the interruption of the southerly littoral flow by the construction of the jetties at the entrance harbor was not a direct invasion or appropriation of plaintiff's property of the kind which entitles plaintiff to compensation, and that the erosion of his land is a consequential damage for which no recovery may be had. Franklin v. United States, supra, and R. J. Widen Co. v. United States, 357 F.2d 988, 174 Ct.Cl. 1020, 1027 (1966).

As an added basis for recovery in this case, plaintiff urges that the erosion of his beachfront property was reasonably foreseeable by the Government at or prior to the time work began on the Canaveral Harbor Project. If we assume this contention is correct, it does not aid plaintiff's case. The same contention has been rejected in similar cases by the courts. Ross Const. Co. v. Yearsley; Franklin v. United States, supra.

Finally, plaintiff, while admitting that the project has not raised the level of the ocean water above the ordinary high-water mark, nevertheless contends that he is entitled to recover because the acts of the defendant have eroded and destroyed fast lands lying above and beyond the high tide mark of the Atlantic Ocean at the shoreline of his property when he purchased the land. We do not find that the Government has made an

unequivocal admission that this is a fact, but we accept it as proven for the purpose of deciding this case. A decision by the Supreme Court clearly demonstrates that proof of this fact by plaintiff would not entitle him to recover. United States v. Twin City Power Co., 350 U.S. 222, 76 S.Ct. 259, 100 L.Ed. 240 (1956). In that case the Supreme Court said at pp. 225–226, 76 S. Ct. at p. 261:

It is argued, however, that the special water-rights value should be awarded the owners of this land since it lies not in the bed of the river nor below high water but above and beyond the ordinary high-water mark. An effort is made by this argument to establish that this private land is not burdened with the Government's servitude. The flaw in that reasoning is that the landowner here seeks a value *in the flow of the stream,* a value that inheres in the Government's servitude and one that under our decisions the Government can grant or withhold as it chooses. It is no answer to say that payment is sought only for the location value of the fast lands. That special location value is due to the flow of the stream; and if the United States were required to pay the judgments below, it would be compensating the landowner for the increment of value added to the fast lands if the flow of the stream were taken into account.

There is no doubt that plaintiff has sustained damages and that a substantial portion of the damages he claims are due to the construction and maintenance of the Canaveral Harbor Project. However, in order to permit recovery in this case, it would be necessary for us to overrule the cited decisions of this court and to ignore many controlling decisions of the Supreme Court. Since we decline to do so, it follows that defendant's motion for summary judgment is granted, plaintiff's motion for summary judgment is denied, and the petition is dismissed.