**Loy Ree B. Marlowe BALLAM, Appellee,**

v.

**UNITED STATES of America, Appellant,**

**and**

**State of South Carolina, Defendant.**

**No. 83–1120.**

United States Court of Appeals, Fourth Circuit.

Argued March 6, 1984.

Decided Oct. 23, 1984.

Ervin, Circuit Judge, filed a dissenting opinion.

Maria A. Iizuka, Dept. of Justice, Washington, D.C. (F. Henry Habicht, II, Asst. Atty. Gen., Washington, D.C., Henry Dargan McMaster, U.S. Atty., Glen E. Craig, Asst. U.S. Atty., Columbia, S.C., Robert L. Klarquist, Dept. of Justice, Washington, D.C., on brief), for appellant.

Augustine T. Smythe, Charleston, S.C. (Morris A. Ellison, Buist, Moore, Smythe & McGee, Charleston, S.C., H.F. Bell, Chesterfield, S.C., on brief), for appellee.

Before PHILLIPS, MURNAGHAN and ERVIN, Circuit Judges.

MURNAGHAN, Circuit Judge:

The appellee, Loy Ree B. Marlowe Ballam, brought suit in the United States District Court for the District of South Carolina, 552 F.Supp. 390 (1982) claiming erosion damage to her real property caused by the Atlantic Intracoastal Waterway (AIWW). Because the claim was for less than $10,000, the district court had jurisdiction. *See* 28 U.S.C. § 1346(a)(2). The district court awarded Ballam $8,804 in damages.

The United States raises two grounds for reversal. One, it argues that the suit is barred by a release given by Ballam's predecessor-in-title, her father. Two, it contends that the erosion is not compensable because Ballam's land was, and is, burdened by the government's dominant navigational servitude, precluding a finding that there was a taking by the government.

### I.

In 1931, the United States authorized the improvement and extension of the Atlantic Intracoastal Waterway from Cape Fear River, North Carolina, to St. Johns River, Florida. *See* Act of July 3, 1930, ch. 847, 46 Stat. 918, 924. The issues here derive from events occurring in a segment of the AIWW in Horry County, South Carolina. The act provided, *inter alia,* that local interests, in the present case the State of South Carolina, would furnish, free of cost

to the United States, rights of way of sufficient width for a canal prism and the disposal of soil therefrom. The predecessor-in-title to Ballam (with his wife renouncing dower), by instrument dated September 10, 1931, conveyed to South Carolina for one dollar a perpetual easement, a covenant running with the land, over a 320 foot wide strip running 1700 feet for the construction and maintenance of the waterway. The deed of Ballam's predecessor recognized explicitly that the purpose for which it was obtained was to facilitate construction of a section of the AIWW. It further provided that the channel created for the waterway would be maintained as "a part of the navigable waters of the United States."

South Carolina, in obtaining the grant from Ballam's predecessor, secured inclusion in its terms of a release from all claims for damages from construction and maintenance of the AIWW. The release also covered claims for damages relating to deposit of soil.

South Carolina, in turn, conveyed the easement to the United States. The United States Army Corps of Engineers proceeded to construct the extension of the AIWW. The initial dimensions of the waterway were 8 feet deep with a channel 75 feet wide.[1]

In 1941 the dimensions of the AIWW in the Horry County area were increased to a depth of 12 feet and a width of 90 feet. Thereupon, 85 feet of the easement granted by Ballam's predecessor remained above water, 53 feet of which were on the side of the waterway where Ballam's retained land is located.[2]

Thereafter, erosion, found by the district judge to have been created by the wave wash of passing vessels traversing the AIWW, ate away the 53 feet of the easement on the side occupied by Ballam and intruded on her property not subject to the easement to a distance of 4 feet on the west and 29 feet on the east, namely, 2,000 square feet or .046 of an acre.

## II.

The deed from Ballam's predecessor which granted an easement for the AIWW contained the following release:

> The grantor does hereby waive and release the grantee, its successors and assigns and its or their officers, agents, servants, and contractors from any and all claims for damages which may result from the *construction and maintenance of the waterway and the deposit of spoil* or other matter as hereinbefore stated. This waiver and release of damages being intended as a continuing covenant which shall run with the land and be binding upon the grantor and on his ... heirs, successors and assigns.

(Emphasis added). The government claims that the release bars the present suit. The district court ruled that the release only applied to the easement, not to the retained land of the grantor and his successors which was unencumbered by the easement.

In *Hilton v. Duke Power Co.*, 254 F.2d 118 (4th Cir.1958), the court interpreted a release signed by the grantors of an easement. The court said:

> It is a general rule, well established, that "the construction of the release as to the actual intent of the parties presents a question of fact to be determined from the surrounding conditions and circumstances, construed with reference to the amount of consideration paid and the language of the release itself." 45 Am.Jur., "Release," Sec. 28, p. 692.

---

1. The deed of Ballam's predecessor stated that the waterway would be constructed in accordance with the project report set forth in H.R. Doc. No. 41, 71st Cong., 1st Sess. (1929) (*Report*) and adopted in the Act of July 3, 1930, ch. 847, 46 Stat. 918, 924. The report recommended that the intracoastal waterway from Cape Fear River, North Carolina, to Charleston, South Carolina, should have a depth of 12 feet at mean low water and a bottom width of 90 feet, with the understanding that the canal prism should initially be excavated for a depth of 10 feet at mean low tide and a bottom width of 75 feet. *Report* at 60.

2. Plaintiff only owns part of the lands which touch upon the easement granted by her predecessor-in-title.

*Id.* at 124. The district court found that at the time the easement was granted it was reasonable to assume that the waterway probably would not extend over the entire 320 feet granted in the easement. Thus, the parties only intended that the release apply to suits arising from activities on the easement itself.

■ Since the intent of the parties is a question of fact and the record contains evidence supportive of the conclusion reached, the district court's finding is not clearly erroneous. Furthermore, a simple reading of the language of the release strongly suggests that the waiver of claims for construction and maintenance damages does not here apply. Erosion through wave wash is neither construction nor maintenance. Rather, it is destructive and creates a need for maintenance.

### III.

Were, as is the case with other sections of the AIWW, the Horry County portion here involved a natural body of water,[3] it would clearly be a navigable body of water[4] subject to the dominant navigational servitude of the United States.[5] In that case, the erosion here complained of would not be compensable by the United States. *See Pitman v. United States,* 457 F.2d 975, 198 Ct.Cl. 82 (1972).

■ The United States' plenary admiralty jurisdiction does extend to man-made bodies of water which are navigable. *Ex parte Boyer,* 109 U.S. 629, 3 S.Ct. 434, 27

L.Ed. 1056 (1884). However, the fact that a man-made stream is "navigable" does not, in and of itself, mean that the United States' navigational servitude attaches to it. In *Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979), the Court held that, although a privately owned pond which was connected to a navigable bay by a private, manmade improvement was "navigable water," the government's attempt to create a public right of access to the pond was a taking requiring compensation. Similarly, in *Vaughn v. Vermilion Corp.,* 444 U.S. 206, 100 S.Ct. 399, 62 L.Ed.2d 365 (1979), the Court held that the public had no right of use of private canals connected to navigable waterways.

Nevertheless, in the present case, public right of access and use were fully contemplated and altogether evident from the very outset, prior to the acquisition of easements, in particular prior to the conveyance of September 10, 1931 by Ballam's predecessor. He knew, when he executed and delivered the deed, that public access to the AIWW extension to be constructed in Horry County was part and parcel of the contemplated project. The waterway extension was unmistakably to be built by the United States with public funds. Ballam's predecessor either was compensated for his giving an easement to build a waterway to be generally available for use by the boating public, or he determined that the benefit to his remaining land merited the conveyance for the nominal sum of $1.00. Ba-

---

**3.** Parts of the AIWW, including portions in existence when the grant by Ballam's predecessor dated September 10, 1931 was made, traverse natural bodies of water. However, the portion of the AIWW which touches upon the plaintiff's land is wholly man-made. Prior to construction of the AIWW, the plaintiff's land was wholly land-locked, part of a plain, generally 25 to 50 feet above sea level. *See* H.R.Doc. No. 41, 71st Cong., 1st Sess. 11 (1929).

**4.** At common law, "navigable waters" were defined as those waters subject to the ebb and flow of the tide. The Supreme Court abandoned the common law rule in 1871 and substituted a navigable-in-fact test for determining if waters are "navigable." *See The Daniel Ball,* 77

U.S. (10 Wall.) 557, 563, 19 L.Ed. 999 (1871). The AIWW is both subject to the ebb and flow of the tide and navigable-in-fact.

**5.** The navigational servitude describes the power whereby the United States need not compensate private owners for damage to their property caused by improvements to navigable streams, which aid navigation and do not raise the level of the stream. *See United States v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co.,* 312 U.S. 592, 596–99, 61 S.Ct. 772, 775–76, 85 L.Ed. 1064 (1941); *see also* Fitts and Marquis, *Liability of the Federal Government and Its Agents for Injuries to Real Property Resulting from River Improvements,* 16 Tenn.L.Rev. 801 (1941).

llam's predecessor acknowledged in his grant that the waterway would be part of "the navigable waters of the United States."

Ballam's predecessor and others similarly situated thus appreciated the intent to create on the properties for which easements were granted exactly the same situation or condition as already existed in extant situations of properties adjoining naturally created segments of the AIWW. As a matter of intent, derived from the four corners of the instrument, the parties to the easement grant and to the transfer thereof contemplated that the situation would be the same after the AIWW had been extended as though it had always existed as a product of natural forces. Upon these facts we hold that the AIWW, even as constructed in Horry County, had from the outset of its existence the attributes of a natural, publicly navigable waterway subject to the dominant navigational servitude of the United States.

■ The Fifth Amendment to the Constitution requires that the United States compensate persons when it takes their property. The government, nevertheless, need not pay compensation for damage to land that would have occurred in the absence of government improvement of a waterway. In *Sanguinetti v. United States*, 264 U.S. 146, 44 S.Ct. 264, 68 L.Ed. 608 (1924), the Court held that the government was not liable for flooding caused by a canal because the land would have flooded in its natural state. In *Loesch v. United States*, 645 F.2d 905, 227 Ct.Cl. 34 (1981), *cert. denied*, 454 U.S. 1099, 102 S.Ct. 672, 70 L.Ed.2d 640 (1981), it was held that the government was not liable for erosion caused by flooding of the Ohio River because the government's dams did not increase the natural frequency, duration or peaks of floods.

■ The waterway in the present case was wholly constructed by the United States. However, the grant of Ballam's predecessor estops Ballam from claiming the waterway is artificial so long as the government has done nothing to alter the waterway in a fashion not contemplated at the time the plaintiff's predecessor granted the easement. The waterway has never been expanded by the government beyond the scope originally contemplated by the report referred to in the deed from Ballam's predecessor. The purpose was to create a navigable waterway indistinguishable from one which came about through application of the forces of nature. Thus, we treat the waterway in Horry County as if it were a natural river.

■ There can be no liability on the part of the United States for erosion damage unless there is a showing that the United States directly and proximately caused the damage. *See Loesch v. United States*, 645 F.2d 905, 227 Ct.Cl. 34 (1981), *cert. denied*, 454 U.S. 1099, 102 S.Ct. 672, 70 L.Ed.2d 640 (1981). The erosion damage in the present case was caused by wave wash from passing ships, not the actions of the United States.[6] Thus, the district court should have entered judgment in favor of the United States.

REVERSED AND REMANDED FOR ENTRY OF JUDGMENT IN FAVOR OF THE UNITED STATES OF AMERICA.

ERVIN, Circuit Judge, dissenting:

The majority's conclusion hinges on the assumption that the grant of the original easement created "exactly the same situation or condition" that would have existed if the waterway in Horry County had been natural and not man-made. If one accepts this premise, then it is clear that the section of the waterway that crossed Mrs. Ballam's land was subject to the dominant navigational servitude of the United States

---

6. Indeed, apart from other applicable provisions of the grant from Ballam's predecessor, on the basis of the dominant navigational servitude alone, any other damage that may have been caused by direct, government action to the AIWW to aid navigation but did not increase the level of the stream (*e.g.*, dredging) is also non-compensable. *See Pitman v. United States*, 457 F.2d 975, 198 Ct.Cl. 82 (1972).

and any erosion that occurred beyond the boundaries of the easement was noncompensable.

I remain unconvinced that this premise is valid. The deed expressly limited the easement in the initial grant to a strip of land 320 feet wide and 1700 feet long. Within these precise boundaries, Mrs. Ballam's predecessor authorized the United States, through the State of South Carolina, to construct a canal linking two stretches of natural waterway. The easement granted no more and no less than the exact piece of land described in the deed. The document states only that the grantor

> does grant, bargain, sell and release unto the said State of South Carolina, its successors and assigns, the perpetual right and easement to enter upon, excavate, cut away, and remove any and all of the hereinbefore described tract numbered 37–A as may be required at any time for construction and maintenance of the said inland waterway, or any enlargement thereof, and to maintain the portion so excavated and the channel thereby created as a part of the navigable waters of the United States; and the further perpetual right and easement to enter upon, occupy and use any portion of said tract numbered 37 not so cut away and converted into public navigable water as aforesaid, for the deposit of dredged material and for such other purposes as may be needful in the construction, maintenance, and improvement of the said inland waterway; reserving, however, to the grantor, his, her, its heirs, successors and assigns, all such rights and privileges in said tract of land as may be used and enjoyed without interfering with or abridging the rights and easements hereby conveyed.

J.A. at 14. Had Mrs. Ballam's predecessors wished to grant the government land for the waterway *and* such additional land as would be needed or consumed during construction and use of the canal, that understanding could easily have been included in the deed.

In my view the majority has read far more into the words "created as a part of the navigable waters of the United States" than is warranted by a careful reading of the grant limited to the four corners of the document. The grant makes clear that the government will not only construct but maintain the waterway: "the said grantor does grant [the stated tract] as may be required for *construction* and *maintenance* of the said inland waterway." J.A. at 14 (emphasis added). It is unclear to me why a servitude protecting the government from liability for its failure to maintain the sides of the canal and protect against erosion should now be read into the deed.

A taking by the government is permissible provided there is reasonable compensation to the owner. *See United States v. Causby*, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946); *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922). An initial lawful taking, however, cannot be expanded without additional compensation. *See United States v. Virginia Electric & Power Co.*, 365 U.S. 624, 81 S.Ct. 784, 5 L.Ed.2d 838 (1961). Were the Atlantic Intercoastal Waterway a highway, the use of which had caused the destruction of adjoining land, there is no question that the government would be required to compensate for the adjoining land as well as the land on which the highway sat. The same principles apply here. I see no just reason why Mrs. Ballam should suffer potentially the loss of her entire property without compensation simply because the government failed to construct a waterway in a manner that ensured the terms of the easement grant would not be violated.

The majority, of course, goes on to argue that "wave wash," and not the government, was responsible for the erosion. Thus, even if a navigational servitude did not exist, in their view there was insufficient causation to establish a compensable taking under the fifth amendment. The problem with this argument, however, is that it ignores the obvious; but for the government the waterway would not have crossed Mrs. Ballam's land. I am hard-

pressed to determine who or what, other than the government, is responsible for the damage. To draw a distinction between "wave wash" and the government amounts to a distinction without real meaning.

Because the initial easement makes no provision for the use of land beyond the specific boundaries set out in the deed, and because the government's actions resulted in the taking of fast[1] land beyond those boundaries, I would affirm the decision of the district court.

---

1. Fast land is defined as: Mainland; esp: land that is high and dry near water: upland. *Webster's Third New International Dictionary* 827 (1976). There was no inland waterway across Mrs. Ballam's land prior to the execution of the easement and the construction carried out by the government. The majority proceeds on the assumption that the execution of an easement and the subsequent building of a portion of the inland waterway across fast land where there was no natural waterway originally vests in the United States a right of dominant navigational servitude identical to that existing where there was a natural navigable waterway in the beginning. I do not believe that either the law or the easement in question produces such a result nor did the signature parties to the easement so intend.