Loy Ree B. Marlowe BALLAM, Appellee,

v.

The UNITED STATES, Appellant.

Appeal No. 86–1058.

United States Court of Appeals, Federal Circuit.

Nov. 28, 1986.

Maria A. Iizuka, Dept. of Justice, Washington, D.C., argued for appellant. With her on the brief were F. Henry Habicht, II, Asst. Atty. Gen. and Robert L. Klarquist. Also on the brief were Vinton DeVane Lide, U.S. Atty., and Glen E. Craig, Asst. U.S. Atty., Columbia, S.C.

Augustine T. Smythe, Buist, Moore, Smythe & McGee, Charleston, S.C., argued for appellee. With him on the brief was Morris A. Ellison. Also on the brief was H.F. Bell, Chesterfield, S.C.

Before MARKEY, Chief Judge, NICHOLS, Senior Circuit Judge, and BISSELL, Circuit Judge.

NICHOLS, Senior Circuit Judge.

Appellee Ballam brought this suit in the United States District Court for the District of South Carolina under the "Little Tucker Act," 28 U.S.C. § 1346(a)(2), claiming "just compensation," not over $10,000, for erosion of her upland, called by her a "taking" of it, resulting from waves on a portion of the inland waterway (Atlantic Intracoastal Waterway), running across it. This portion, unlike most of the waterway, is artificial, cut by the United States through her land pursuant to an easement so authorizing, granted by her predecessor-in-title in 1931 to South Carolina, and by it retransferred to the United States. The district court (Spears, J.), after trial, made findings and conclusions of law, upholding appellee's claim and awarding $8,804, of which $664 was for land already lost to erosion and the remainder for the anticipated cost of protecting the remainder by sloping and revetment. 552 F.Supp. 390 (1982). The United States appealed and we reverse. We hold no taking was shown and therefore no just compensation is due.

## I

The waterway is an ambitious undertaking to create a safe sheltered passage along the coast for the smaller natures of vessels. It makes use mostly of natural waters inside the barrier islands, already there if needing dredging and buoys, but includes some artificial cuts such as that here involved. It does not involve use of any dams to raise the natural water level, which remains at or near that of the adjacent ocean, and thus the case does not present the "flowage easement" problem such as the Army Engineers often present to the courts in connection with their river improvements. Numerous "flowage easement" cases are strained and distorted by the parties herein to make them fit the instant issues.

The original grant of the easement to South Carolina by O.J. Bell, dated October 15, 1931, recites his awareness that by the Rivers and Harbors Act of 1930, Congress provided for a section of the waterway, from Cape Fear River, North Carolina, to St. Johns River, Florida, local interests to provide free of cost rights-of-way sufficient for the canal prism and the disposal of spoil

therefrom. The easement as he granted it was 1,700 feet in length and 320 feet wide. As enlarged in 1941, the canal was about 235 feet wide at the "top" of the waterway. Ballam, who now owns but a part of Bell's original tract on the north side of the cut, has within it 58 feet of the unused portion of the right-of-way. Bell received $1 in consideration from the state which, in turn, granted the easement to the United States as all parties intended. The easement is—

> [T]o enter upon, excavate, cut away, and remove any and all of [two tracts as specified by metes and bounds] as may be required at any time for construction and maintenance of the said inland waterway, or any enlargement thereof, and to maintain the portion so excavated and the channel thereby created as a part of the navigable waters of the United States; and the further perpetual right and easement to enter upon, occupy and use any portion of said [tracts, as above stated] not so cut away and converted into public navigable water as aforesaid, for the deposit of dredged material, and for such other purposes as may be needful in the construction, maintenance, and improvement of the said inland waterway; * * *.

There was also a waiver of damages as follows:

> The grantor does hereby waive and release the grantee, its successors and assigns and its or their officers, agents, servants, and contractors from any and all claims for damages which may result from the construction and maintenance of the waterway and the deposit of spoil or other matter as hereinbefore stated; this waiver and release of damages being intended as a continuing covenant which shall run with the land and be binding upon the grantor and on his, her, its heirs, successors and assigns.

There is nothing express in this grant as to how erosion by wave action was to be dealt with; what is implied we consider later. There is no evidence the parties anticipated the problem. Erosion commenced, however, and is found to have been caused principally by the wash from vessels using the waterway. Another Mr. Bell commenced complaining on behalf of his family to the Army Engineers who had built the waterway and were operating it. A letter by the district engineer, February 5, 1976, to Mr. Bell, acknowledges that "erosion is a problem all along this portion of the waterway." He states, however:

> A review of Federal responsibilities concerning bank erosion reveals that the Corps of Engineers is without authority to undertake works to control bank erosion on private lands bordering the Waterway.

He suggests they consult the South Carolina State Development Board—

> [W]hich is the sponsor for the Waterway project and the agency designated to provide the items of local cooperation necessary for Federal participation in the project construction and maintenance.

Apparently the idea here is that having undertaken to provide necessary rights to the Federal Government without cost, South Carolina ought to bear this unforeseen cost. He ends, however, he will be pleased to advise Mr. Bell regarding what type of structure might be required to "combat your particular erosion problem." Translated from Bureaucratese, this appears to mean that Mr. Bell and those he represents must bear the revetment or like expenses that are needed themselves, or get them from South Carolina.

Mr. Bell filed this action in 1982, seeking damages not over $10,000 and injunctive relief. South Carolina was joined but dismissed on the ground it was not the party damaging the Ballam property, a determination not challenged in this appeal. The decision appealed from, after a trial before Judge Spears without a jury, holds that the United States cannot invoke a navigation servitude because its rights are derived from the easements granted and not from its sovereign rights to aid navigation. Even if they were, however, they would not include the right to erode "fast lands," which are well above high tide. He re-

fused grant of an injunction, because the "Little Tucker Act" does not so provide.

The case then took an unfortunate turn. The government appealed to the Fourth Circuit although the Federal Courts Improvement Act, Pub.L. No. 97–164, was then in effect, and provided that jurisdiction of "Little Tucker Act" appeals resided here. 28 U.S.C. § 1295(a)(2). The Fourth Circuit proceeded in all good faith to decide the case on the merits. 747 F.2d 915 (1984). It held for reversal by a divided panel. Ballam petitioned for certiorari and the Supreme Court vacated the judgment and remanded with directions to transfer to this court. — U.S. ——, 106 S.Ct. 844, 88 L.Ed.2d 886 (1986). This has been done and so the case is here, all this time and litigation cost for $8,804. It is suggested, "to save judicial resources," we should adopt the vacated decision as our own, which possibly we could do by taking its words as ours, though we could not revive the jurisdiction of the Fourth Circuit. We agree generally with what it says, and are greatly aided by its analysis. However, we prefer to state our legal conclusion in our own words in view of our position as the sole appellate court to decide, under the Supreme Court, the meaning of the Tucker Act with respect to claims under the Constitution.

## II

■ The district court and the Fourth Circuit both take up first the government's reliance on the clause waiving future claims for damages, according to them a threshold defense. Both say it is unavailable for that purpose. We agree on the simple ground that it does not clearly and unambiguously waive any claim except a claim against the government for doing what it is elsewhere given the right to do, *i.e.*, to dig and maintain a canal and deposit spoil on the portion of the banks within the easement boundaries. We must construe the 1931 grant as a whole and not decide the case on this portion of it extracted from its context.

The government also relies on a defense under the statute of limitations. 28 U.S.C. § 2401(a). When the right of action first accrued may turn, however, on what property right the government is supposed to have taken and by what act the government took it. We will, therefore, return to the statute of limitations issue after we have answered these basic questions.

## III

■ Turning now to the merits, the question is often rhetorically stated to be whether the government may take, without compensation, all of Mrs. Ballam's upland beyond the easement line (appellee's brief at 30), or that she faces, if the government prevails, "potentially the loss of her entire property without compensation" (dissent of Judge Ervin, 747 F.2d at 920). The real issue, however, is much narrower. It is who, Mrs. Ballam or the government, must defray the cost, found to be $8,160, to provide a revetment stopping the erosion. This would protect a property found to be worth $65,000, and the government, having no wish to erode further, offered to assist her by advice if she elected to do it. It is only whether that cost should be shifted to the government that is at issue here.

It should go without saying that not every economic injury is a taking. As Justice Jackson wrote in *United States v. Willow River Power Co.*, 324 U.S. 499, 502–03, 65 S.Ct. 761, 764, 89 L.Ed. 1101 (1945), a Tucker Act case:

The Fifth Amendment, which requires just compensation where private property is taken for public use, undertakes to redistribute certain economic losses inflicted by public improvements so that they will fall upon the public rather than wholly upon those who happen to lie in the path of the project. It does not undertake, however, to socialize all losses, but those only which result from a taking of property * * *. But not all economic interests are "property rights"; only those economic advantages are "rights" which have the law back of them, and only when they are so recog-

nized may courts compel others to forbear from interfering with them or to compensate for their invasion. * * * We cannot start the process of decision by calling such a claim as we have here a "property right"; whether it is a property right is really the question to be answered.

In accordance with that analysis, the first issue to be decided here is whether Mrs. Ballam's claim to be compensated for the cost of a revetment, as calculated and awarded by the district court, is a property right. That is the only real issue. The government does not claim a right to erode Mrs. Ballam's land. It is, and always was, perfectly willing for her to erect safeguards to avert that possibility. The issue is whether she has a property right to shift the cost of those safeguards. The government denies she has any such right. It denies liability for any erosion that results from her failure to erect safeguards at her own expense.

If Mrs. Ballam has a property right to shift such costs, it must result from the language of Mr. O.J. Bell's grant of October 15, 1931, quoted above. The grant, however, says nothing expressly to guide us here. The Fourth Circuit majority found a strong implication that the rights and duties between the government and adjacent landowners who granted easements for artificial parts of the waterway, should be the same as those that existed along natural parts of the waterway. This interpretation resides particularly in the words—

> [A]nd to maintain the [said waterway or any enlargement thereof, and to maintain the] portion so excavated and the channel thereby created as part of the navigable waters of the United States; * * *.

The grant further refers to the cut as "public navigable waters." The fact the cut will be part of the segment of the inland waterway as enlarged under the 1930 Rivers and Harbors Act, is also mentioned. The grantor such as O.J. Bell, who retained land outside the easement, would look to the situation respecting the natural portions of the waterway to see what his rights were *vis a vis* the Army Engineers. So far as he was concerned, the cuts were to become navigable waters as soon as dug and opened for shipping to use. It is therefore natural, and an implied term of the grant, that the grantor should look for guidance as to his property rights, to those of upland owners adjacent to natural waterways which have been developed for navigation by the Army Engineers without making new cuts through the land. Erosion is not, of course, confined to artificial cuts, but is common in all coastal waters. It may result from natural waves, from artificial waves caused by vessels, or from currents, and may be caused for the first time, or greatly increased, by dredging, jettying, etc., done by the Army Engineers, which does not impinge directly on the eroded land at all. The Fourth Circuit rightly says, 747 F.2d at 919:

> As a matter of intent, derived from the four corners of the instrument, the parties to the easement grant and to the transfer thereof [by South Carolina to the United States] contemplated that the situation would be the same after the AIWW [Atlantic Intracoastal Waterway] had been extended as though it had always existed as a product of natural forces.

It hardly is pretended that the government would be responsible to landowners on natural navigable water for erosion caused by public works which do not themselves impinge on such upland but only cause water to do so by waves or currents causing erosion. The appellee, and the court below, cite no such cases. There is one the other way, a binding precedent in this court, by one of our predecessors, *Pitman v. United States*, 457 F.2d 975, 198 Ct.Cl. 82 (1972). It involved a tract of Florida ocean beach rapidly and continuously eroding following the Army Engineers' construction of jetties for a new harbor entrance, in no part on plaintiff's land, but causing the erosion by diverting to a new and destructive direction ocean

currents that previously had been harmless:

Thus, while a riparian owner has a right to have navigable waters come to him unchanged in their natural condition as against other riparian owners, he has no such right against the paramount power of the United States to improve navigation. [Citing cases.]

*Id.* 457 F.2d at 977, 198 Ct.Cl. at 86.

That precedent makes this case a fortiori in one respect. There, no human actions did anything to bring about the result after the Army Engineers built the jetty, but here, of course, the harm resulted directly and proximately from the acts of persons navigating vessels up and down the waterway, and generating waves therein. We are not, however, inclined to give this fact as much significance as the Fourth Circuit did and as the United States does in its brief. It is a consideration more appropriate to tort law. The decisive point is that Pitman had no property right to be safeguarded by the Army Engineers against collateral consequences of navigation improvements. Had Pitman's erosion resulted from the wash of vessels using the new harbor entrance, the law would have been the same.

Neither the trial court, nor Judge Ervin in his dissent, contended that the *Pitman* case would not be good law if this part of the waterway were natural, not an artificial cut. Their position rather is, as we read it, that the easement grant defines the area the government has a right to impair in any manner, and thus the mutual rights and duties are unlike those that would obtain with a natural waterway. If, however, one realizes that we are not concerned with a claim by the government that it has a right to erode by wave wash Mrs. Ballam's land outside the easement area, the case does not look the same. It offered to assist her (by advice) in selecting means to prevent such erosion. The issue is the government's contention it has a right to open the channel to navigation without incurring any liability for measures thereby made necessary to prevent erosion. Mrs. Ballam says it does incur such liability.

The award is almost wholly the cost of such measures. The geographical scope of the easement is irrelevant to this. If Mrs. Ballam has the property right she claims at all, it would seem it would be equally valid for land within the easement area, but not yet used for canal enlargment or spoil; she could have that covered by revetment at government expense also. We believe the statements referred to, favoring her claim, really reflect acceptance of the rhetoric that the government claims a right to erode all her land.

## IV

■ Our consideration of the government's statute of limitations defense, 28 U.S.C. § 2401, has been deferred because we could not determine the date of accrual of the claim until we determined what is claimed. Now we know appellee asserts a property right to have suitable revetments constructed at public expense to protect her land against erosion by waves made by vessels passing along the waterway. What we decide about jurisdiction will not affect the result, but could affect the *res judicata* and collateral estoppel consequences of what we say and hold. Statutes fixing limitations on suits for money damages against the United States are jurisdictional because they are preconditions on the consent of the United States to be sued, which must be strictly construed. *Soriano v. United States*, 352 U.S. 270, 77 S.Ct. 269, 1 L.Ed.2d 306 (1957); *Kabua v. United States*, 546 F.2d 381, 212 Ct.Cl. 160 (1976), *cert. denied*, 434 U.S. 821, 98 S.Ct. 63, 54 L.Ed.2d 77 (1977).

Mr. H.F. Bell, on behalf of this appellee and others, notified the Army Engineers December 8, 1975, that erosion causing property loss was occurring. He claimed a right to have action taken to prevent future erosion, and damages for what had occurred already. The Army Engineers conducted a field reconnaissance from which they learned "that erosion is a problem all along this portion of the Waterway." On February 5, 1976, the district engineer advised Mr. Bell of this, but declined "to

undertake works to control said erosion on private lands bordering the Waterway." He referred Mr. Bell to the South Carolina State Development Board. He "would be pleased to advise you regarding the general type of structure required to combat your particular erosion problem."

Considering the peculiar type of property right asserted in this action, and the main basis of the award, a right to have the Army Engineers construct or finance revetments or other structures to inhibit erosion, we do not think a cause of action could have accrued before the Army Engineers had been informed of the claim and had ruled upon it. The ordinary claim case such as *Soriano, supra,* is inapposite. A suit would have been premature before demand and refusal. It was up to them to decide how they would respond if they thought the claim valid: by new public works or by money. *Friedman v. United States,* 310 F.2d 381, 159 Ct.Cl. 1 (1962), *cert. denied,* 373 U.S. 932, 83 S.Ct. 1540, 10 L.Ed.2d 691 (1963). Therefore, the cause of action, if any, accrued February 5, 1976, and as the complaint was filed in the district court January 25, 1982, it was within six years and timely. The district court therefore had jurisdiction, as do we, to consider in our case more than whether we have jurisdiction.

To the small extent, $644, the award was for land actually washed away before the date of judgment, this occurred also within six years before action filed, as we read the findings. The judge finds seven, but this apparently is to the date of his order.

The government's statute of limitations argument seems to assert the cause of action accrued whenever Mrs. Ballam had reason to know that erosion on the waterway was going to be a problem. This hardly requires to be refuted: anticipation that land in future will wash away if nothing is done is not accrual.

### Conclusion

Accordingly, the judgment below is reversed with directions to dismiss the complaint.

REVERSED.

BISSELL, Circuit Judge, dissenting-in-part.

I respectfully dissent to part III of the majority opinion. The majority analyzes the taking issue by looking first at what property right Ballam alleges was taken by the government. The majority says the right asserted is the right to be compensated for the cost of a revetment, which both parties concede is necessary to stop the erosion of Ballam's land. The majority concludes that the taking issue resolves itself when one realizes that the government does not claim the right to erode Ballam's land.

I do not think the majority correctly answers the question it says is the key to the case: What property right does Ballam assert was taken by the government? The right asserted is not the right to be compensated for a revetment, rather it is the right to exclusive use of her property. It is true, that the government does not claim the right to erode Ballam's property, but the wave action in the waterway dug by the government is daily taking a portion of Ballam's property and denying her the exclusive use of it. The government does not claim the right to take more, but the wave action will continue to do so until a revetment is built.

A homey analogy illustrates the problem. If my neighbor and I own adjoining lots, to which each has exclusive use, and my neighbor's dog comes upon my lot and digs up my flower bed, under the majority's analysis I must forego all damages as it is I who must bear the cost of erecting a fence to stop the "taking" of my flowers, because my neighbor does not claim a right to have his dog come upon my property and disturb my flower bed.

The district court found that Ballam was entitled to damages in the amount of $644 for property lost through erosion, and $8,160 to protect the land from future erosion for a total damage award of $8,804. In my example, applying the district court's damage analysis, I would be entitled to

damages of X amount of dollars for my flowers plus X amount to build a fence to keep an uncontrollable and continuing trespasser off my property. Under the majority's analysis, I would be entitled to no damage award as it is my responsibility to keep the trespasser off my land while my neighbor bears no responsibility for my lost flowers or for the prevention of any recurrence.

In this case, if the easement granted by Ballam's predecessor in title and assigned to the government means anything, it means that Ballam has given up the right to exclusive use of that portion of her land described in the easement, but not the rest of her land. In my view, Ballam has a right to the exclusive use of her property outside the easement. The government should not be allowed to take that property right without just compensation.

The remedy in this situation is, however, different than in most taking cases because the taking is continuous. Our courts cannot enjoin the waves or my neighbor's dog; they can, however, require the responsible party, in this case the government, to bear the cost of erecting a barrier that will prevent the taking from continuing. Furthermore, contrary to the majority's analysis, the government should be required to compensate Ballam for her eroded land outside the easement.

I agree with the position of the trial court and Judge Ervin as posited by the majority: "[T]he easement grant defines the area the government has a right to impair in any manner, and thus the mutual rights and duties are unlike those that would obtain with a natural waterway." Majority op. at 1022.

The government argues that even if a navigational servitude did not exist, there is insufficient causation to establish a compensable taking under the fifth amendment. I agree with Judge Ervin's rebuttal to this "wave wash argument":

> The problem with this argument, however, is that it ignores the obvious; but for the government the waterway would not have crossed Mrs. Ballam's land. I am hard-pressed to determine who or what, other than the government, is responsible for the damage. To draw a distinction between "wave wash" and the government amounts to a distinction without real meaning.

*Ballam v. United States,* 747 F.2d 915, 920–21 (4th Cir.1984) (Ervin, J., dissenting).

I would affirm the decision of the trial court.