**KINGSPORT HORIZONTAL PROPERTY REGIME and Kingsport Homeowners Association, Inc., et. al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

Nos. 94–145 L, 94–163 L, 98–863 L, 94–149 L, 98–861 L, 98–864 L, 94–155 L, 98–862 L, 98–865 L.

United States Court of Federal Claims.

May 16, 2000.

Thornwell F. Sowell of Sowell, Todd, Lafitte, Beard & Watson, L.L.C., Columbia, South Carolina, with whom was H.F. Bell, Chesterfield, South Carolina, for plaintiffs.

Alan Brenner, Department of Justice, Washington, D.C., for defendant.

## OPINION

WIESE, Judge.

### Introduction

This case comes before the court on cross-motions for summary judgment as to the government's liability, under the Fifth Amendment of the United States Constitution, for the alleged taking of plaintiffs' property. Plaintiffs, nine land owners of individual properties located on the Atlantic Intracoastal Waterway in Horry County, South Carolina, seek just compensation for land lost as a result of erosion on the government-constructed waterway. Defendant defends on the ground that wave-wash generated by private boat traffic, and not the government's construction of the waterway, was the direct and proximate cause of plaintiffs' injuries, thereby precluding Fifth

Amendment compensation. The parties have briefed the issue and oral argument was held on May 9, 2000. We now rule in plaintiffs' favor, and accordingly deny defendant's motion for summary judgment.

## Background

The Atlantic Intracoastal Waterway was designed and built by the United States government in the late 1930s to facilitate the inland transport of goods along the Atlantic coast.[1] While the waterway was designed, in the main, to follow the natural flow of existing river channels, the construction of a continuous waterway required the government to cut a connecting channel through parts of Horry County, South Carolina, pursuant to easements granted by the state and by individual property owners for that purpose.

In exchange for a nominal sum, the landowners granted either 320– or 380–foot easements to the government for the construction of the waterway. Under the easements, the government, acting through the Army Corps of Engineers, was given the right to construct and maintain the waterway, including the right to excavate or enlarge the waterway without incurring liability for resulting damages. The easements additionally specified that the waterway would be maintained "as a part of the navigable waters of the United States."

As initially constructed, the waterway had a depth of 8 feet with a bottom width of 75 feet. The Army Corps of Engineers (the agency responsible for the waterway's construction and maintenance) later expanded the waterway in 1941 to a depth of 12 feet, with a bottom width of 90 feet and a top (water surface) width of 235 feet. Documents of the Corps of Engineers reveal that the banks of the waterway were subject to erosion from the waterway's inception.

In 1982, one of the property owners along the banks now in dispute filed suit in South Carolina District Court seeking compensation for land lost as a result of erosion along the waterway. The trial court recognized the validity of the claim and awarded the plaintiff $8804, representing compensation for both the value of the eroded land and the cost of constructing a revetment to prevent further damage. *Ballam v. United States*, 552 F.Supp. 390 (D.S.C.1982). On appeal, the Fourth Circuit reversed, concluding that plaintiff's legal stance was the same as if her property were located adjacent to a natural river, and thus the erosion inflicted by passing ships was deemed insufficient to render the government liable for a taking. *Ballam v. United States*, 747 F.2d 915, 919 (4th Cir.1984).

The Supreme Court later vacated the Fourth Circuit's decision on jurisdictional grounds and transferred the case to the Federal Circuit. *Ballam v. United States*, 474 U.S. 1078, 106 S.Ct. 844, 88 L.Ed.2d 886 (1986). The Federal Circuit in turn concluded that Mrs. Ballam had "no property right to be safeguarded by the Army Engineers against collateral consequences of navigation improvements," and denied her claim. *Ballam v. United States*, 806 F.2d 1017, 1022 (1986), *cert. denied*, 481 U.S. 1014, 107 S.Ct. 1889, 95 L.Ed.2d 496 (1987).

The validity of that ruling was called into question two years later in *Owen v. United States*, 851 F.2d 1404 (Fed.Cir.1988). Revisiting the legal underpinnings of *Ballam* without revisiting the underlying factual circumstances, the Federal Circuit determined that the *Ballam* court had erred in failing to recognize "the existence of horizontal limits to both easements and navigational servitudes, beyond which government-caused erosion results in a taking under the Fifth Amendment." *Id.* at 1415 n. 12. Overruling *Ballam* to the extent that it had neglected to acknowledge those limits, the court concluded that once "the erosion resulting directly from the government's construction of the artificial waterway reached the land outside the easement right-of-way ... the cost of revetments necessary to protect land outside the easement [should have been] borne by the government." *Id.* at 1415.

---

1. The Atlantic Intracoastal Waterway is defined in 33 U.S.C. § 1804(6) (1994) as "[t]wo inland water routes approximately paralleling the Atlantic coast between Norfolk, Virginia, and Miami, Florida, for 1,192 miles via both the Albermarle and Chesapeake Canal and Great Dismal Swamp Canal routes."

In light of that holding, a number of landowners who, like Mrs. Ballam, own property along the Atlantic Intracoastal Waterway, brought suit to recover damages for land lost to erosion outside of the government's easement. Following a trial to determine the timeliness of their claims, this court concluded that four of those plaintiffs presented claims not barred by the statute of limitations. *Boling v. United States,* 41 Fed.Cl. 674 (1998). To that number were later added five other claims—representing properties that had not been eroded past their respective easement boundary lines as of the date of the original filing (but had experienced erosion thereafter), bringing the number of litigants now before the court to nine.

The central facts in this stage of the litigation are not in dispute. The parties agree that plaintiffs' properties have suffered erosion beyond their respective easement lines, and that such erosion is due to the waves generated by private boat traffic on the waterway. We are now asked to determine the legal significance of those facts as they relate to a claim for just compensation under the Fifth Amendment.

### Discussion

Defendant seeks dismissal of plaintiffs' claims on the ground that it is wave-wash from passing boats—and not any government action—that is the direct and proximate cause of the erosion of plaintiffs' lands. Defendant contends that the issue of causation was resolved in the government's favor by the Fourth Circuit in *Ballam,* 747 F.2d 915, and that the Federal Circuit later endorsed that finding in *Ballam,* 806 F.2d 1017. Because plaintiffs have offered no additional evidence to distinguish their claims from the one decided in *Ballam,* defendant urges us to adopt as our own the finding of those earlier courts that wave-wash, rather than the government, proximately caused the damage.

Plaintiffs do not dispute that the erosion of their properties resulted, in the main, from the activities of private boat traffic on the waterway. In plaintiffs' estimation, however, it was the government's construction of the waterway that set in motion the erosive forces that would eventually take plaintiffs' lands. The erosion, plaintiffs argue, would not have occurred but for the waterway's construction, rendering the government's action the direct cause of plaintiffs' injuries.

### I.

■ It is settled law that the Federal Government, under the Commerce Clause of the United States Constitution, has the power to improve navigable waterways in the interest of facilitating navigation. *United States v. Chandler–Dunbar Water Power Co.,* 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063 (1913). It is equally well established, however, that navigational improvements that result in damage to private property located above the water's ordinary high-water mark can constitute a Fifth Amendment taking of property and thus render the government liable for the payment of just compensation. *United States v. Kansas City Life Ins. Co.,* 339 U.S. 799, 70 S.Ct. 885, 94 L.Ed. 1277 (1950), *Owen,* 851 F.2d 1404.

■ In order to establish a taking claim under the Fifth Amendment, a plaintiff must first demonstrate by a preponderance of the evidence that the government's action was the direct and proximate cause of the injury suffered. *Sanguinetti v. United States,* 264 U.S. 146, 149–50, 44 S.Ct. 264, 68 L.Ed. 608 (1924). Where the government's action is the direct and proximate cause of erosion to private property above the high-water mark, courts have indeed held the government liable for such damages. *See, e.g., United States v. Dickinson,* 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947); *Stockton v. United States,* 214 Ct.Cl. 506, 1977 WL 5317 (1977). But where the government's action has been found not to be the direct and proximate cause of the erosion, courts have refused to find the government liable for a Fifth Amendment taking. *See, e.g., Yazel v. United States,* 118 Ct.Cl. 59, 93 F.Supp. 1000 (1950); *Coates v. United States,* 124 Ct.Cl. 806, 110 F.Supp. 471 (1953); *Sanguinetti,* 264 U.S. 146, 44 S.Ct. 264; *Matthews v. United States,* 87 Ct.Cl. 662, 1938 WL 3992 (1938).

It is this requirement of proximate causation that defendant contends has not been

met in the present case. In defendant's view, plaintiffs have failed to demonstrate any connection between the waterway's construction and the erosive forces occasioning the harm. The government's action, defendant maintains, is only a remote, incidental and indirect cause of the erosion, thereby precluding any liability for the ensuing damage.

Were plaintiffs' properties located on a naturally occurring waterway, defendant would be correct in its assertion that the government could not be held liable for damages due to erosion. That conclusion flows in part from the fact that owners of property situated on navigable waterways possess their land subject to the public's superior right of access to the water, and to the government's pre-existing dominant navigational servitude over the river's bed.[2] *Scranton v. Wheeler*, 179 U.S. 141, 163, 21 S.Ct. 48, 45 L.Ed. 126 (1900). As a consequence, the natural effects of navigation—including erosion resulting from wave-wash—cannot give rise to liability. What defendant's position ignores, however, is the fact that the waterway was not naturally occurring but was instead man-made. That distinction is crucial to the determination of causation in at least three respects: erosion would not have been possible but for the construction of the waterway; boat traffic was an anticipated, and indeed intended result of the waterway's construction; and easements—rather than a dominant navigational servitude—define the limits of the government's right to infringe on plaintiffs' lands.

## A. The Waterway is the But–For Cause of the Injury Suffered

Central to our thinking in the determination of liability is the fact that the government itself created the possibility for navigation—and hence for erosion—where it did not otherwise exist. In constructing a waterway through formerly dry or non-navigable land, the government rendered plaintiffs vulnerable to harm that "otherwise would not have occurred," without the government's in-

tervention. *Yazel*, 118 Ct.Cl. at 73, 93 F.Supp. at 1004. This but-for relationship between the government's action and the subsequent harm has alone been found sufficient to confer liability. *Tri–State Materials Corp. v. United States*, 213 Ct.Cl. 1, 550 F.2d 1 (1977); *M.R.K. Corp. v. United States*, 15 Cl.Ct. 538, 545 (1988) (describing a "but/for" relationship between the government action and the harm as "all that is required" for establishing liability).

The fact that the waterway is an artificial one, however, is not dispositive. The salient point is that the waterway's existence subjected plaintiffs' properties to conditions and risks different from those that would naturally have been experienced. *See, e.g., Sanguinetti*, 264 U.S. 146, 44 S.Ct. 264 (concluding that the overflow of water from a man-made canal was non-compensable since the land had been subject to flooding prior to the canal's construction). It is this altering of natural conditions on which liability in physical takings cases is most often predicated. *See, e.g., Loesch v. United States*, 227 Ct.Cl. 34, 645 F.2d 905 (1981).

Nor are we persuaded to treat the waterway as a naturally occurring body of water as the Fourth Circuit did in *Ballam*. While the easements granted by the landowners acknowledged that the resulting waterway would be maintained as part of the navigable waters of the United States, that pronouncement neither transformed the man-made channel into a natural one nor immunized the government from liability for a taking. As the Supreme Court cautioned in *Kaiser Aetna v. United States*, 444 U.S. 164, 171, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979), courts must make "careful appraisal of the purpose for which the concept of 'navigability' [i]s invoked" in determining its significance. In *Kaiser Aetna*, the Supreme Court took up the question of whether improvements to private property—specifically the conversion of a privately owned pond into a marina through a constructed channel connecting to navigable waters—"caused its original char-

---

2. The government's dominant navigational servitude—a doctrine arising under the Commerce Clause of the United States Constitution—permits the government to regulate and improve navigable waters without incurring liability for damages incidental to the government's activities suffered within the waterway's natural bed.

acter to be so altered that it became subject to an overriding federal navigational servitude," thus converting the formerly private pond into a "public aquatic park." While the Court held that the resulting marina fell within the definition of "navigable waters" and was thus subject to regulation by the Corps of Engineers, it refused to conclude that the government could require public access to the privately owned waterway without paying just compensation.

Here, we accept the view that plaintiffs' dedication of their properties reflected an understanding that, upon its completion, the waterway would be treated as a naturally existing portion of a navigable channel. As in *Kaiser Aetna*, however, we do not believe that the characterization of a body of water as navigable for one purpose necessarily determines its status as navigable water for all purposes. Specifically, we understand the easement grant to allow the government to build and maintain a canal and, *within the bounds of the easement*, to be afforded the same protection on the artificial waterway as the government would enjoy on a natural one.[3] That grant does not include any waiver of property rights for land located outside the easement, however, for the simple reason that in obtaining the easement, the government implicitly represented that it would need the encumbered land—and no more—to satisfy it requirements. Indeed, to conclude that the waterway was to be treated in all respects as a natural river would obviate the need for an easement entirely.

Our conclusion that the easement does not so alter the character of the land outside the easement so as to render it subject—without compensation—to the government's possession preserves the crucial distinction between property that forms the banks of a naturally occurring waterway and property that gains its riparian character through the government's construction activities. And it is this distinction that the *Owen* court had in mind when it cautioned: "To allow the navigational

servitude to attach to nonnavigable water or land which is being made navigable would allow the government to build artificial canals for use in interstate commerce without ever paying just compensation for the land in which a canal was built." *Owen*, 851 F.2d at 1417. As the Supreme Court noted in *United States v. Dickinson*, 331 U.S. at 750, 67 S.Ct. 1382, "if the Government cannot take the acreage it wants without also washing away more, that more becomes part of the taking."

## B. Boat Traffic was an Anticipated and Intended Result of Waterway's Construction

The fact that the harm to the plaintiffs' properties does not occur without the involvement of private boat traffic does not change our conclusion that the government's action proximately caused plaintiffs' injuries. As an initial matter, we note that "[t]he permanence of the consequences of the Government act is controlling," and that there is "no additional requirement that the instrumentality of the consequence be purely a governmental one." *Tri–State Materials Corp. v. United States*, 213 Ct.Cl. at 7, 550 F.2d at 4 (refusing to attach significance to the distinction between governmental and non-governmental waters as the source of injury). This is especially true where the end result—the use of the waterway by private boat traffic—was both the anticipated and intended consequence of the waterway's construction.

The Fifth Amendment does not require that the government itself physically appropriate land to give rise to a taking; it is sufficient that the government's action set in motion the forces that cause the damage. Thus when the government builds a dam and thereby occasions the flooding of neighboring property, the overflowing waters are not, in any literal sense, an agent of the government. Yet, in flooding a riparian owner's

3. The language of the easement to which we are referring permits the government:

> to enter upon, excavate, cut away, and remove any and all of [the respective tracts] described as composing a part of the canal prism, as may be required at any time for construction and

maintenance of the said Inland Waterway, or any enlargement thereof, and to maintain the portion so excavated and the channel thereby created as a part of the navigable waters of the United States ....

fast lands, the government has no less taken the landowner's property than if the Corps of Engineers itself had invaded and carved away the land. *Coates v. United States*, 117 Ct.Cl. at 796, 93 F.Supp. at 638. We see no reason to distinguish that situation from the one in which the government builds a waterway for boat traffic which later has the effect of eroding neighboring fast lands. As in the flooding cases, the government has created a condition that would not otherwise have existed and that results naturally, if not inevitably, in the damage to which the landowner is subject. The presence of boat traffic is not an incidental result of the waterway's construction, but is the natural and inevitable consequence of it.

The significance of the fact that the waterway was designed to facilitate precisely the boat traffic now causing the erosion cannot be overstated. As noted in the Restatement (Second) of Torts, "any harm which is in itself foreseeable, as to which the actor has created or increased the recognizable risk, is always 'proximate,' no matter how it is brought about, except where ... it is not within the scope of the risk created by the original negligent conduct." Restatement (Second) of Torts § 442B cmt. b (1965).

We are thus bound to conclude, as Judge Ervin did in his dissent in *Ballam*, that drawing a distinction between wave-wash and the government—where the government was responsible for building the waterway on the property and did so to facilitate boat traffic— "amounts to a distinction without real meaning." *Ballam*, 747 F.2d at 920–21.

C. The Easement Defines the Scope of Government's Rights Over Plaintiffs' Land

As discussed above, the government, by obtaining the easements, was given domain over the encumbered land similar to its dominant navigational servitude over naturally occurring, navigable waterways. But its power to make navigational improvements without incurring liability went no further than the bounds of the easement. As the court pointed out in *Owen*, "once the erosion resulting directly from the government's construction of the artificial waterway reached the land outside the easement right-of-way, *Dickinson*

instructs that the cost of revetments necessary to protect land outside the easement be borne by the government." *Owen*, 851 F.2d at 1415.

Through the granting of easements, plaintiffs essentially conferred on the government by contract the same authority that it possessed under the Commerce Clause—the authority to regulate and improve navigation. It is the easement, then, that determines the scope of that power. As the court noted in *Owen*, "the bounds of the easement granted to the government should properly define the boundary relevant to a taking analysis related to the initial canal construction. No navigational servitude existed prior to the cut and, after the cut created navigable water, the high-water mark which would have defined the limits of the servitude in *Ballam* was within the easement boundaries." *Id.* at 1415 n. 12.

Because the government's authority emanates not from common law principles or from constitutionally conferred rights, the basic principles underlying the government's immunity from liability in the navigational servitude context—that land in a navigable stream is not susceptible to private ownership; that the limit on the riparian landowner's title is a pre-existing one—simply do not apply to property outside the easement. Implicit in the government's receipt of the easements was its duty not to violate the easements' terms. To the extent that the waterway, built by the government to enable navigation, has encroached upon land outside that original grant, the government must be held liable for a taking.

II.

As a final matter, we do not believe, as defendant maintains, that the Federal Circuit in *Ballam* came to a conclusion contrary to our own. As we noted at the outset of this discussion, defendant argues that the Federal Circuit explicitly addressed the issue of causation in *Ballam*, holding that the erosion to Ballam's property "resulted directly and proximately from the acts of persons navigating vessels up and down the waterway." *Ballam*, 806 F.2d at 1022. It is this finding

that the government now urges us to adopt as our own.

To understand the context of the Federal Circuit's reference to causation, we begin, as that court did, with the decision in *Pitman v. United States,* 198 Ct.Cl. 82, 457 F.2d 975 (1972). In *Pitman,* the court concluded that the government could not be held liable for damage to beachfront property eroded by previously harmless ocean currents that were later made destructive by the government's construction of jetties not located on the plaintiff's land. The *Ballam* court characterized the *Pitman* holding as standing for the proposition that "[i]t hardly is pretended that the government would be responsible to landowners on natural navigable water for erosion caused by public works which do not themselves impinge on such upland but only cause water to do so by waves or currents causing erosion." *Ballam,* 806 F.2d at 1021. It was in that context that the Federal Circuit offered the statement regarding causation that defendant now relies on. The court noted:

> That precedent [*Pitman*] makes this case a fortiori in one respect. There, no human actions did anything to bring about the result after the Army Engineers built the jetty, but here, of course, the harm resulted directly and proximately from the acts of persons navigating vessels up and down the waterway, and generating waves therein.

However, the court went on to conclude:

> We are not, however, inclined to give this fact as much significance as the Fourth Circuit did and as the United States does in its brief. It is a consideration more appropriate to tort law. The decisive point is that Pitman had no property right to be safeguarded by the Army Engineers against collateral consequences of navigation improvements. Had Pitman's erosion resulted from the wash of vessels using the new harbor entrance, the law would have been the same.

*Id.* at 1022.

To the extent that the predicate of the foregoing discussion—that Pitman had no property right against collateral consequences of navigational improvements—was

overruled by *Owen,* it can hardly be said now that the court's reasoning would remain unaffected by that development. And we do not understand the Federal Circuit's observation—made in passing and given little weight by the court itself—to represent a deliberate and intentional finding of fact as to causation. Rather, as the quoted language itself demonstrates, the point was unessential to the legal principle relied upon.

### Conclusion

In *Owen,* the Federal Circuit invited the government to prove on remand either that the damage alleged was "not the result of its action" or was "such an indirect consequence of it as not to be a compensable taking." *Owen,* 851 F.2d at 1418. The government here can do neither. To the extent that the erosion would not have occurred had the government not constructed the waterway, the government's action is sufficient to confer liability. It is irrelevant that other factors— e.g. the private boat traffic—compounded the damage. Wave-wash was a hazard of the type made possible—even specifically anticipated—by the canal's construction, and the government's action need not be the sole instrumentality for defendant to be held responsible.

Accordingly, defendant's motion for summary judgment as to the government's liability is denied and plaintiffs' cross-motion is granted.