William D. BOLING, Individually, William D. Boling, as Trustee of the Agnes T. Boling Living Trust, and W. Frank Boling, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

Nos. 93–84 L, 94–140 L to 94–165 L.

United States Court of Federal Claims.

Sept. 8, 1997.

Thornwell F. Sowell, Sowell, Todd, Lafitte, Beard & Watson, L.L.C., Columbia, SC, with whom was H.F. Bell, Chesterfield, SC, for plaintiffs.

Alan Brenner, Department of Justice, Washington, DC, for defendant.

## *OPINION*

### Introduction

Plaintiffs, individual owners of some thirty separate properties located adjacent to a Government-constructed waterway, allege that they have suffered erosion of their lands and are entitled to compensation for these losses pursuant to the Takings Clause of the Fifth Amendment to the U.S. Constitution. They have filed twenty-six suits against the U.S. Government. In response, defendant asserts that the complaints sound in tort, and thus are not within this court's jurisdiction, that nineteen of the claims are time-barred, and that one of the plaintiffs is barred by the doctrine of res judicata. In addition, defendant seeks partial summary judgment.

### *The Factual History*

Plaintiffs each own property along the Atlantic Intracoastal Waterway ("the Waterway") in Horry County, South Carolina. The Waterway runs along the length of the eastern seaboard, and in most areas follows the course of natural waters occurring inside barrier islands. In some areas, however, artificial cuts were made in the land to continue the navigable path of the Waterway. The section of the Waterway at issue in this suit was constructed in the mid 1930's and early 1940's by defendant, acting through the Army Corps of Engineers. As part of the construction process, the State of South Carolina obtained rights-of-way from landowners owning property adjacent to the site. These areas were then granted by the State to defendant, and subsequently recorded in the records of Horry County. The rights-of-way granted by these landowners ranged from 320 to 380 feet in width.

Documents of the Army Corps of Engineers ("the Corps") show that erosion has been occurring along the banks of the Waterway since its construction. *See* Christopher P. Jones, P.E., EARTH TECH, *Bank Erosion Study. Atlantic Intracoastal Waterway, Horry County. South Carolina* 13–14 (1995) (discussing early Corps documents) [hereinafter *"Bank Erosion Study"*]. For example, in 1945, the Corps expressed concern over sedimentation resulting from erosion and caving of the Waterway's banks, and in 1976, the Corps concluded that erosion had removed most of the monuments that marked the limits of defendant's right-of-way. *See id.*

In 1982, one of the plaintiffs in the present action, Loy Ree Ballam, filed suit in federal district court alleging that her land had been "taken" within the meaning of the Fifth Amendment due to erosion caused by waves on the Waterway. *See Ballam v. United States*, 552 F.Supp. 390 (D.S.C.1982), *rev'd*, 747 F.2d 915 (4th Cir.1984), *vacated*, 474 U.S. 1078, 106 S.Ct. 844, 88 L.Ed.2d 886, *rev'd*, 806 F.2d 1017 (Fed.Cir.1986). The trial court found that erosion had occurred to plaintiff's property up to and beyond defendant's easement line, and that the primary cause of the erosion was wave wash from vessels using the Waterway. Further, the court found that "the erosion is a continuous process and unless remedial measures are taken, her property will continue to erode in the future." *Id.* at 392. The court awarded plaintiff $644 for the value of the land taken, plus $8160 for the cost of installing a revetment to protect the land from future erosion. *See id.* at 393.

After a somewhat convoluted procedural path,[1] the Court of Appeals for the Federal Circuit reversed the trial court's award, hold-

---

1. On appeal from the district court, the Court of Appeals for the Fourth Circuit reversed, holding that, due to the easement granted to defendant, plaintiff's legal stance was the same as if her

ing that the plaintiff had "no property right to be safeguarded by the Army Engineers against collateral consequences of navigation improvements." *Ballam v. United States,* 806 F.2d 1017, 1022 (Fed.Cir.1986). Two years later, the Federal Circuit revisited this legal pronouncement—without revisiting the underlying factual circumstances—in *Owen v. United States,* 851 F.2d 1404 (Fed.Cir. 1988). In that case, the Federal Circuit overruled *Ballam* for its failure to recognize "the existence of horizontal limits to both easements and navigational servitudes, beyond which government-caused erosion results in a taking under the Fifth Amendment." *Id.* at 1415 n. 12. As such, once "the erosion resulting directly from the government's construction of the artificial waterway reached the land outside the easement right-of-way ... the cost of revetments necessary to protect land outside the easement [should have been] borne by the government." *Id.* at 1415.

*The Present Claims*

Plaintiff Ballam has now been joined by 25 owners of other parcels of land adjoining the Waterway in bringing suit against the U.S. Government pursuant to the Tucker Act, 28 U.S.C.A. § 1491 (West 1994), for the erosion-caused takings of their properties under the Fifth Amendment. Specifically, plaintiffs allege that "waves created by boat traffic, the ebb and flow of the tide and other natural actions of water in man-made canals, in addition to improper maintenance of the Waterway, have caused and continue to cause erosion" to their land outside defendant's right-of-way, as well as their land within the right-of-way but beyond the area required for construction or enlargement and maintenance of the Waterway. According to plaintiffs, this erosion "was foreseeable to the United States when it constructed the Waterway for use by boats, and the United States directly and proximately caused the erosion by failing to properly design and maintain the Waterway." Plaintiffs claim a right to compensation for the actual land taken by erosion, as

well as the cost of revetments necessary to protect their land from future erosion.

Defendant has responded with a series of dispositive motions, which together form the basis for this opinion. First, defendant has moved for summary judgment against plaintiff Ballam on the grounds that, in light of her previous suit against defendant to recover for erosion damage, her claim is barred by the doctrine of res judicata. Second, defendant has moved for summary judgment as to plaintiffs' claims for the cost of revetments, arguing that they have no property right to bank protection at the expense of defendant. Third, defendant has moved to dismiss a majority of the suits on the grounds that they are barred by the six-year statute of limitations applicable to Tucker Act claims. Finally, defendant has moved to dismiss all of the suits on the grounds that their operative allegations sound in tort—an area over which this court lacks subject-matter jurisdiction.

The court will address defendant's jurisdictional motions first, for there will be no need to reach a legal determination as to any claims over which the court concludes that it lacks jurisdiction. As such, the court must first decide whether plaintiffs' claims sound in tort—and thus fall outside the scope of the Tucker Act—and then whether, even if they are a proper subject matter for this court's jurisdiction, the claims are time-barred. "The statute of limitations is jurisdictional in the Court of Federal Claims." *Creppel v. United States,* 33 Fed. Cl. 590, 594 (1995) (citing *Soriano v. United States,* 352 U.S. 270, 273, 77 S.Ct. 269, 271–72, 1 L.Ed.2d 306 (1957); *Broughton Lumber Co. v. Yeutter,* 939 F.2d 1547, 1550 (Fed.Cir.1991); *Hart v. United States,* 910 F.2d 815, 817 (Fed.Cir. 1990)).

### Discussion

### I.

*Tort vs. Taking*

 Defendant has moved under U.S.C.F.C. Rule 12(b)(1) to dismiss plaintiffs'

---

property were located adjacent to a natural river, and thus the erosion inflicted by passing ships was deemed insufficient to render defendant liable for a taking. *See Ballam v. United States,* 747 F.2d 915, 919 (4th Cir.1984). The Supreme Court vacated that judgment and remanded with

directions to transfer to the Court of Appeals for the Federal Circuit, *see* 474 U.S. 1078, 106 S.Ct. 844, 88 L.Ed.2d 886 (1986), which had been given exclusive appellate jurisdiction over such cases. *See* 28 U.S.C.A. § 1295(a)(2) (West 1993).

claims on the grounds that "[t]he operative allegations of a taking of plaintiffs' lands as set forth in their pleadings sound in tort," and that therefore "this court lacks subject matter jurisdiction" over the claims. Defendant bases its argument on the Tucker Act, which establishes that this court "shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress ... not sounding in tort." 28 U.S.C.A. § 1491(a)(1) (West 1994).

The allegations raised by plaintiffs on which defendant's motion is based are found in paragraph 7 of plaintiffs' amended complaint, which reads:

Following construction of the Waterway, waves created by boat traffic, the ebb and flow of the tide and other natural actions of water in man-made canals, in addition to improper maintenance of the Waterway, have caused and continue to cause erosion to plaintiffs' property.... This erosion was foreseeable to the United States when it constructed the Waterway for use by boats, and the United States directly and proximately caused the erosion by failing to properly design and maintain the Waterway so as to prevent the erosion. The erosion is a direct result of the defendant's improper design, construction, and maintenance of the Waterway and/or flows from an intentional act, the natural consequence of which is to take plaintiffs' property.

▮ In determining whether to dismiss a case for lack of jurisdiction over the subject matter, the court must assume the validity of any undisputed allegations of fact made by plaintiffs. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Poorbaugh v. United States,* 27 Fed. Cl. 628, 631 (1993). Plaintiffs bear the burden of establishing jurisdiction by a preponderance of the evidence. *Reynolds v. Army and Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed.Cir.1988).

▮ Defendant asserts that the language chosen by plaintiffs indicates that their allegations center on defendant's supposed negligence. As such, defendant argues, plaintiffs are in reality seeking recovery for tortious conduct by the Government's agents. The

court disagrees. The fact that plaintiffs may consider certain aspects of the Government's conduct to be negligent does not automatically remove their claims from this court's takings jurisdiction. The question of whether the invasion of property by the Government amounts to a taking as opposed to a tort does not turn on the care (or lack thereof) with which an authorized governmental action is pursued, but upon the extent of injury occasioned by the Government's action. "The essential inquiry is whether the injury to the claimant's property is in the nature of a tortious invasion of his rights or rises to the magnitude of an appropriation of some interest in his property permanently to the use of the Government." *National By–Products, Inc. v. United States,* 186 Ct.Cl. 546, 577, 405 F.2d 1256 (1969).

In *Bettini v. United States,* 4 Cl.Ct. 755, 757 (1984), for example, the plaintiff brought a takings claim after a federally owned road collapsed onto his property and caused an ensuing mudslide. The plaintiff alleged that his losses were "directly attributable to ... the acts and omissions of the defendant United States in its design, construction, maintenance and operation of [the road]," and that defendant had thereby taken the property without just compensation. *Id.* The defendant argued that these allegations sounded in tort, and that this court thus lacked jurisdiction over the claim. The court in *Bettini* first noted that "[d]efendant's characterization of its actions as tortious ... is not determinative of the nature of the invasion." *Id.* at 758. What needed to be determined, rather, "is whether the extent of the alleged invasion of plaintiff's rights in the property rises to the level at which compensation is required." *Id.* The court found that the collapse of earth across plaintiff's property, even though a one-time occurrence, was sufficient as alleged to survive defendant's motion to dismiss. *See id.* at 758, 761.

In this case, the erosion of plaintiffs' land, as alleged, is of a permanence and completeness such that labeling it anything less than a taking would be nonsensical. Their properties have not merely been subjected to a temporary but recurring flood, or to an unwelcome deposit of silt—both situations

which have been recognized as sufficiently permanent to merit compensation as takings. *See Turner v. United States,* 901 F.2d 1093, 1095 (Fed.Cir.1990) ("[T]o show a servitude has been imposed through a taking by flooding, a plaintiff must prove that the land is subject to permanent or inevitably recurring floods."); *Bettini,* 4 Cl.Ct. at 759. Rather, the alleged erosion results in an outright loss *of* the land—as opposed to damage to the land—as if falls into the Waterway. Thus, regardless of plaintiffs' portrayal of the actions that gave rise to the erosion, the nature of the alleged invasion by the Government is such that, if established, it would clearly constitute a taking.

Defendant next latches on to plaintiffs' allegation that the taking is the result of an "intentional act." Because plaintiffs "have not and will not be able to point to any authority conferred by Congress upon the corps of Engineers to *intentionally* cause erosion injuries to private property abutting the Waterway," defendant argues that they cannot maintain a claim in this court "to recover damages for the unauthorized acts of government officials." (emphasis in original).

■■ It is true that, "before a compensable taking can be found by the court, there must be some congressional authorization, express or implied, for the particular taking claimed." *Southern California Financial Corp. v. United States,* 225 Ct.Cl. 104, 108, 634 F.2d 521 (1980). However, to be considered "authorized," the taking need only be "a natural consequence of Congressionally approved measures," or else result from "the good faith implementation of a Congressional Act." *NBH Land Co. v. United States,* 217 Ct.Cl. 41, 44, 576 F.2d 317 (1978). Further, in evaluating a takings claim, the actions of the defendant "cannot be characterized as unauthorized merely because they may have been mistaken, imprudent, or wrongful." *Eyherabide v. United States,* 170 Ct.Cl. 598, 606, 345 F.2d 565 (1965).

In this case, plaintiffs do not allege—and need not show—that defendant intentionally constructed the Waterway so as to erode plaintiffs' adjoining land; rather, plaintiffs allege—and very well might show—that defendant intentionally constructed the Wa-

terway, and a natural consequence of that construction was the erosion of plaintiffs' adjoining land. Given that the Waterway's construction was authorized by Congress in the River and Harbors Act of 1930, *see Ballam v. United States,* 806 F.2d 1017, 1018 (Fed.Cir.1986), the alleged taking was likewise authorized. As such, plaintiffs' complaint falls clearly within this court's takings jurisdiction. Defendant's motion to dismiss for want of subject-matter jurisdiction is denied.

## II.

*The Statute of Limitations*

■■ Every claim over which this court has jurisdiction "shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C.A. § 2501 (West 1994). Because the "limitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied," the statute of limitations must be strictly construed. *Soriano v. United States,* 352 U.S. 270, 276, 77 S.Ct. 269, 273, 1 L.Ed.2d 306 (1957). And while "affording plaintiffs what the legislature deems a reasonable time to present their claims," the underlying purpose of statutes of limitations is to "protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise." *United States v. Kubrick,* 444 U.S. 111, 117, 100 S.Ct. 352, 357, 62 L.Ed.2d 259 (1979).

■ A claim first accrues, within the meaning of § 2501, "when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action," *Oceanic S.S. Co. v. United States,* 165 Ct.Cl. 217, 225 (1964), and "the plaintiff was or should have been aware of their existence." *Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573, 1577 (Fed.Cir. 1988). Thus, the court must first determine at what point plaintiffs became entitled to sue defendant for a taking of their property under the Fifth Amendment.

Until erosion crossed the boundary of defendant's easement and began to affect a plaintiff's particular parcel of land, that plaintiff had no grounds on which to base a takings claim under the Fifth Amendment. *See. e.g., Ballam v. United States,* 806 F.2d 1017, 1023 (Fed.Cir.1986) ("[The] argument [that] the cause of action accrued whenever Mrs. Ballam had reason to know that erosion on the waterway was going to be a problem.... hardly requires to be refuted: anticipation that land in future will wash away if nothing is done is not accrual."). The task of identifying the dates on which the easement boundaries were crossed has been made much simpler by the parties' agreement—subject to several exceptions—as to the accuracy of the findings of defendant's expert, Dr. Tim Kana, regarding those dates.

Through the analysis of aerial photos taken over a period of years, a November 1994 ground survey, and a June 1995 site visit, Dr. Kana studied thirty tracts of land that together are the subject of plaintiffs' 26 separate suits against defendant. For nineteen of these tracts, he concluded that the erosion had encroached upon the property at least six years prior to the filing of suit. The estimated encroachment dates for these tracts ranged from as early as 1950 to as late as the mid–1980's. Dr. Kana concluded further that three tracts had not been encroached until at least 1988—*i.e.,* within six years of their corresponding suits' 1994 filing dates—and that eight tracts had not yet been encroached upon at all. Plaintiffs, based on a more recent survey, assert that five of those eight tracts have now been encroached upon—an assertion to which defendant concedes as to four of the disputed tracts.[2]

Thus, as established by the parties' stipulations, three of the tracts have suffered no encroachment at this time; these three suits[3] will be dismissed by the court without prejudice. The parties disagree as to whether one of the tracts, Barefoot Landing,[4] has been encroached upon; the court will not dismiss the accompanying suit at this time, and will give plaintiffs the opportunity to establish that a taking has occurred on the subject property. The parties further agree that seven of the tracts were encroached upon within the six years previous to suit, or later; the timeliness of the suits related to these tracts is therefore not in dispute. The nineteen remaining tracts were encroached upon more than six years prior to the filing of suit, and thus are the subjects of defendant's motion to dismiss based on the statute of limitations.[5]

The nineteen claims subject to this motion involve erosion that crossed over the easement lines of these properties more than six years before the suits were filed. Taken at face value, this chronology would require the claims' dismissal under the six-year statute of limitations governing actions under the Tucker Act. However, plaintiffs offer several arguments as to why their claims may still be heard by the court. They assert first that uncertainties in the legal validity of their asserted property rights and fluctuations in the Corps' bank protection policy justify the tolling of the statute of limitations and/or the postponement of their claims' accrual altogether. Alternatively, plaintiffs argue that, based upon a theory of continuous taking, they are not completely barred from recovery even if the statute of limitations has run against portions of their claims. While the Government bears the burden of proof as to

2. These tracts are owned by William E. Gore (Case No. 94–165L; Parcel Nos. 14N—tract 1 and 14S—tract 2), Carrie Lee Ward (Case No. 94–159L; Parcel No. 23N), and Claude A. White (Case No. 94–161L; Parcel No. 25N).

3. The landowners whose cases are to be dismissed without prejudice are Linnie E. Gore (Case No. 94–151L; Parcel No. 16N), Margaret W. Thompson (Case No. 94–157L; Parcel No. 21N), and A.William Thompson (Case No. 94–162L; Parcel No. 17N).

4. Case No. 94–142L; Parcel No. 1S.

5. Plaintiffs assert that the margin of error underlying Dr. Kana's conclusions—ten years in either direction, according to plaintiffs—could bring encroachment of one of the nineteen parcels—George Vereen's (Case No. 94–163L; Parcel No. 22S—Tract 1) to within the six-year period. However, upon reviewing the deposition testimony of Dr. Kana, the court holds that the occurrence of such a sizable error is too improbable to justify such a chronological leap. Vereen's parcel remains subject to defendant's statute of limitations motion.

the statute of limitations defense, a plaintiff bears the burden of proof as to the applicability of any exceptions. *See Creppel v. United States*, 33 Fed. Cl. 590, 594 (1995). The court will address each of plaintiffs' arguments in turn.

First, plaintiffs argue that equitable principles warrant tolling the statute of limitations in this case. They base this primarily on their perception that "[u]ntil the Corps' policy regarding erosion was fixed with the issuance of the decision in *Owen v. United States*, 851 F.2d 1404 (Fed.Cir.1988), it would have been futile for plaintiffs to bring a claim for a taking." As plaintiffs see it, this futility stems from a Corps policy regarding bank protection that was in a "constant state of flux," as well as courts' earlier rejection of the property rights asserted by plaintiffs in this case. According to plaintiffs, before *Owen* was decided, "it was uncertain ... whether the plaintiffs had suffered a taking and/or whether the courts would enforce the plaintiffs' property rights outside the government's easement." Plaintiffs assert that "[t]his uncertainty stayed accrual of [their] claims." And because plaintiffs filed their suits within the six years following the issuance of *Owen*, they argue that none of the claims are time-barred.

As discussed briefly above, in *Ballam v. United States*, 806 F.2d 1017, 1022 (Fed.Cir. 1986), the court ruled that the Government had the "right to open the [Waterway] to navigation without incurring any liability for measures thereby made necessary to prevent erosion." Because the Government was seen to enjoy the same rights on the Waterway within its easement as it would on a natural waterway, the court noted that "[i]t hardly is pretended that the government would be responsible to landowners on natural navigable water for erosion caused by public works which do not themselves impinge on such upland but only cause water to do so by waves or currents causing erosion." *Id.* at 1021. In other words, the landowner did not have the "right to have the Army Engineers construct or finance revetments or other structures to inhibit erosion," *id.* at 1023, when that erosion is caused by Government activity within the limits of its easement.

In *Owen v. United States*, 851 F.2d 1404 (Fed.Cir.1988), the plaintiff sought compensation for losses incurred when the Corps of Engineers' dredging of a river resulted in erosion that undermined her land and house. At the trial level, the Court of Federal Claims had held that the plaintiff was precluded from recovery because, under *Ballam*, as well as *Pitman v. United States*, 198 Ct.Cl. 82, 457 F.2d 975 (1972), the Government's dominant navigational servitude immunized its dredging activities—all of which occurred below the river's high-water mark—from suit. The Federal Circuit reversed, and in doing so overturned both *Pitman* and, more importantly for our inquiry, *Ballam*.

At the outset, the *Owen* court rejected the view that "no compensation can ever be owed for the consequential effects of construction activities to further navigation undertaken solely within the boundaries of a river bed subject to the navigational servitude." *Owen*, 851 F.2d at 1412. The court noted that "the practical effect of our decision [in *Ballam* ] was to grant to the government the very 'right to erode' which it allegedly did not claim, and left Mrs. Ballam's property rights in her land outside the easement unenforceable." *Id.* at 1414–15. According to *Owen*, the error in *Ballam* was the court's "failure to recognize the existence of horizontal limits to both easements and navigational servitudes, beyond which government-caused erosion results in a taking under the Fifth Amendment." *Id.* at 1415 n. 12. "[O]nce the erosion resulting directly from the government's construction of the artificial waterway reached the land outside the easement right-of-way," the *Owen* court concluded, "the cost of revetments necessary to protect land outside the easement [should have been] borne by the government." *Id.* at 1415. The court overruled *Ballam* to the extent that it allowed "the navigational servitude to reach fast land above and outside the bed of navigable water." *Id.* at 1416.

As noted above, the claim in *Ballam* and plaintiffs' present claims both arise from the same set of factual circumstances. While the erosion has affected land outside the easement right-of-way, the Corps' activity which

caused the erosion occurred within the easement. Further, like the plaintiff in *Ballam*, these plaintiffs too seek both compensation for land lost, as well as the cost of bank protection necessary to prevent future losses. As such, plaintiffs argue that, under the prohibitive holding of *Ballam*, "it would have been futile ... to bring a claim for a taking."

Even assuming that *Ballam*'s legal pronouncement so clearly foreclosed plaintiffs' asserted property rights that the statute of limitations could justifiably be tolled in this case,[6] the period of tolling does not bring any otherwise time-barred plaintiffs within the statute of limitations. The Federal Circuit did not issue its decision until November 28, 1986, and the finality of the decision was not firmly established until the Supreme Court denied certiorari on April 20, 1987. *See Ballam*, 806 F.2d at 1017, *cert. denied*, 481 U.S. 1014, 107 S.Ct. 1889, 95 L.Ed.2d 496 (1987). *Owen* was issued the following year, on July 18, 1988. *See Owen*, 851 F.2d at 1404. Thus, whatever effect *Ballam* had on the validity of plaintiffs' claims, that effect lasted less than fifteen months; if the court were to rule the statute of limitations tolled for that year, plaintiffs still are time-barred.

Plaintiffs attempt to extend the period of tolling to a more helpful length by emphasizing what they describe as "the uncertain policy of the Corps of Engineers with respect to protecting the plaintiffs' properties from erosion outside the government's easement." Until *Owen* was issued, according to plaintiffs, the Corps' policy fluctuated as to its recognition of an obligation to provide bank protection to landowners threatened by erosion on the Waterway. Plaintiffs argue that, as long as the Corps' policy was surrounded by uncertainty, "it was uncertain ... whether the plaintiffs had suffered a taking." As such, plaintiffs assert that their takings claims did not even accrue for statute of

limitations purposes until the Corps' policy was clarified in the wake of *Owen*. While this approach theoretically would bring plaintiffs within the six-year statute of limitations, its conceptual underpinnings do not correspond with any sound theory of accrual of which the court is aware.

Plaintiffs recite a chronology of events involving the Corps which they assert evidences a bank protection policy so uncertain as to justify postponement of their claims' accrual. The chronology begins in 1979, when, according to documents obtained by plaintiffs, the Corps' policy recognized that "[w]hen erosion occurs and exceeds the limits of the acquired right-of-way, there is an obligation to protect the adjacent properties," and that such protection could be achieved "by either revetment works or through acquisition of additional property rights." In 1985, the Corps completed a rip-rap bank protection project along the Waterway adjacent to the Briarwood and Forest I Subdivisions in Horry County, South Carolina. On February 20, 1987, however, in the wake of the decision in *Ballam v. United States*, 806 F.2d 1017 (Fed.Cir.1986), the Corps rescinded the 1979 policy and directed that any requests for bank protection of private property be handled in a manner consistent with *Ballam*. On March 3, 1987, Lieutenant Colonel Stewart H. Bornhoft, a District Engineer for the Corps, wrote Edward T. Fennell (who is not a plaintiff in this case) as follows:

> For many years we had a policy that when erosion occurs along a fastland cut of the [Waterway], there is an obligation to protect adjacent properties. As a result of the recent *Ballam* case, that policy has been rescinded.
>
> The position we now hold is that where erosion is caused by wave action from vessels using the [Waterway], those vessels are responsible for their damages. Adja-

---

6. The appropriateness of tolling under these circumstances is by no means obvious. As the Supreme Court explained in *Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 96, 111 S.Ct. 453, 457, 112 L.Ed.2d 435 (1990) (footnotes omitted):

 Federal courts have typically extended equitable relief only sparingly. We have allowed equitable tolling in situations where the claim-

 ant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass. We have generally been much less forgiving in receiving late filings where the claimant failed to exercise due diligence in preserving his legal rights.

cent landowners should take prudent measures to protect their own property against erosion.

On October 19, 1987, Stewart H. Bornhoft, a Lieutenant Colonel in the Corps, wrote Senator Ernest Hollings, explaining that "[p]rior to the *Ballam* decision, the Corps had a policy which allowed for construction of erosion control structures along a fastland cut under certain conditions." But in the aftermath of *Ballam,* according to Bornhoft's letter, "the Corps considers that it no longer has authority to conduct erosion control projects," and that, while "[w]e are concerned about this [erosion] problem throughout the waterway … the *Ballam* decision has removed our authority to provide a solution." In 1988, the Federal Circuit decided *Owen,* overruling relevant parts of *Ballam,* and in 1989, according to plaintiffs, the Corps reinstated its 1979 bank protection policy.

Defendant does not dispute the validity of the Corps' memoranda from which plaintiffs derived this chronology; however, defendant argues that, if any such policy existed, it was unknown to plaintiffs before they brought suit in this court, and remained so until they obtained the memoranda in 1993 under the Freedom of Information Act, 5 U.S.C.A. § 552 (West 1996). According to defendant, no policy was ever publicly announced by the Corps. And no plaintiff ever demanded bank protection from the Corps pursuant to such a policy prior to suit. To the contrary, the Federal Circuit's opinion in *Ballam* relates that the plaintiff in that case sought bank protection from the Corps before filing her suit, but was informed that the Corps "is without authority to undertake works to control bank erosion on private lands bordering the Waterway." 806 F.2d at 1019. Further, according to defendant, the bank protection performed by the Corps in the Briarwood Subdivision was brought about as a result of the intervention of a United States Senator. "Such political pressure brought to bear upon the Corps by the highest federal official in the State," asserts defendant, "could hardly be characterized by the plaintiffs as some long-standing policy of the Corps."

Assuming that the memoranda obtained by plaintiffs accurately reflect a recognition by the Corps of an obligation to protect the banks of landowners adjacent to the Waterway, plaintiffs have not shown that they were aware of such a policy before they filed suit. Without such a showing, the existence of the policy is irrelevant. Unless plaintiffs refrained from suing based on their knowledge of the Corps' bank protection policy, the substance of the policy—or any fluctuations thereto—could not possibly be a justification for their delay in bringing suit. That is not to say, however, that plaintiffs' vague awareness of some nebulous Corps policy would automatically postpone the accrual of their claims. A promise of bank protection by the Corps would have to be specifically directed toward plaintiffs and sufficiently definite in detail to justify their failure to bring suit. *See Applegate v. United States,* 25 F.3d 1579, 1583–84 (Fed.Cir.1994) (holding that statute of limitations did not bar action where erosion process was gradual, and Government promised relief by enacting legislation authorizing construction of sand transfer plant). In any event, the court need not decide whether the alleged Corps policy was of a nature that would justify deferring suit, as there has been no showing that plaintiffs were aware of the policy at the time of its alleged existence. As such, the fluctuations in the Corps' policy are not a proper basis for either tolling the statute of limitations, or postponing the accrual of plaintiffs' claims.

 Even assuming that the statute of limitations began to run as soon as the erosion expanded beyond the Government's easement into plaintiffs' properties, and that nothing has tolled the statute's running in the meantime, plaintiffs assert that they still are entitled to recover for erosion that has occurred within the six years previous to their filing of suit. They base this assertion on the "continuing claim" doctrine, which holds that when a defendant owes a continuing duty, a new cause of action arises each time the defendant breaches that duty. *See Cherokee Nation of Oklahoma v. United States,* 26 Cl.Ct. 798, 803 (1992). The doctrine "prevents the statute of limitations from protecting an offender in an ongoing wrong, and thereby avoids claims that would

be unactionable simply because they commenced prior to the statutory period." *Id.*

Plaintiffs rely on *Mitchell v. United States,* 10 Cl.Ct. 787, *modifying* 10 Cl.Ct. 63 (1986), in which Native Americans brought suit against the Federal Government for its mismanagement of tribal forests, based on the Government's sale of timber for less than its market value, and on the Government's failure to replant trees as required by statute. On reconsideration, plaintiffs argued that the continuing claim doctrine should apply to their claims for the regeneration of trees. This court agreed, ruling that:

> [T]he series of alleged regeneration wrongs arose not just as the cutting progressed from stand to stand, but also with respect to each individual tree. That is, the existence of a continuing duty to regenerate means that on each day [defendant] failed in its duty to regenerate a given stand, there arose a new cause of action. And those causes of action which arose in the six-year limitations period may be sued upon.

*Id.* at 788.

According to plaintiffs, the reasoning of *Mitchell* applies equally to this case, in which the Waterway "has eroded land continuously since its construction, but the plaintiffs did not have clear notice that the erosion had commenced or would continue beyond the scope of the easement they had granted to the government." Further, the "gradual nature of the erosion process necessarily makes it difficult to determine when the taking or injury first occurred to the plaintiffs' land," and "the degree of damages is equally uncertain, due to the nature of the erosion." These factors give rise to a *Mitchell*-type situation, plaintiffs argue, in which "plaintiffs' claims accrue with each injury to their land, *e.g.,* each falling of a part of their land into the waterway."

For further support, plaintiffs look to *Hilton v. Duke Power Co.,* 254 F.2d 118 (4th Cir.1958), in which the court stated that:

> If the injury to neighboring lands is caused by negligence, or if the cause is abatable, then there arises a continuing cause of action, and while limitations begin to run at the occurrence of the first actual dam-

age, the landowner may at any time recover for injury to his land which occurred within the statutory period.

*Id.* at 122. In light of the fact that plaintiffs' claims center on their alleged rights to have the Corps construct or finance erosion-inhibiting structures on their land, and because the Corps completed a rip-rap project at other subdivisions adjacent to the Waterway, plaintiffs argue that the cause of defendant's alleged taking is abatable. As such, they argue that they can recover for injury to their lands occurring within the six-year period prior to their filing of suit in February 1993.

Defendant responds by correctly pointing out that neither *Mitchell v. United States,* 10 Cl.Ct. 787 (1986), nor *Cherokee Nation of Oklahoma v. United States,* 26 Cl.Ct. 798 (1992), involved takings claims. In *Mitchell,* this court recognized that the defendant, the Bureau of Indian Affairs, had a "duty to maintain each tract of Indian timberland in a state of continuous productivity and to plant whenever necessary to achieve that end." *Id.* at 788. That duty, this court concluded further, "was a continuing one." *Id.* Similarly, in *Cherokee Nation,* the court characterized the continuing claim doctrine as one in which the "defendant owes a continuing duty." 26 Cl.Ct. at 803 (citing *Mitchell,* 10 Cl.Ct. at 788). In that case, the court ruled that the Government held a riverbed in trust for an Indian tribe, and faced ongoing responsibility for trespasses to that land. *See id.* In the case at hand, defendant did not incur a similar "continuing duty" toward plaintiffs by merely constructing the Waterway. Even assuming that defendant can be held liable for the value of plaintiffs' land lost to erosion, defendant has never borne a continuing duty to prevent the erosion from occurring in the first place. While defendant may choose to construct revetments in order to avoid the costs of future liability, it was under no pre-existing obligation to do so. *See* section III, *infra.*

Plaintiffs' reliance on *Hilton v. Duke Power Co.,* 254 F.2d 118 (4th Cir.1958) is similarly misplaced. In that case, the plaintiff sued for damages incurred when the defendant's

dam caused an overflow of water and silt onto his land, rendering 200 acres unsuitable for cultivation. *See id.* at 120. The trial court had overturned a jury's award of damages to the plaintiff, ruling as a matter of law that, because the silting had begun to injure the plaintiff's land outside the six-year period set forth in the applicable statute of limitations, the plaintiff's recovery was barred. *See id.* at 121. The Fourth Circuit reversed, holding that "[i]t would impose an obligation too stern ... to declare as a matter of law that ... a plaintiff is always charged at the first appearance of damage with a foresight of its ultimate spread." *Id.* at 126. However, the court cautioned:

> [I]f an actual injury amounting to a taking occurs, suit must be brought within the period of limitations by the property owner not only for the actual injury that has occurred but also for any additional injuries which were foreseeable and estimable when the taking occurred. Recovery may subsequently be had for additional injuries which were not foreseeable and estimable when the taking occurred if suit is brought within the period of limitations after such injuries have been realized.

*Id.* at 123.

The nature of the alleged taking in this case differs from the flooding in *Hilton.* In *Hilton,* the damage resulted from a chain of events: a lake formed behind the defendant's dam, which caused silt to accumulate in an adjoining creek and its branches; the silting gradually diminished the creek's banks; and eventually the creek and its branches overflowed onto plaintiff's land. *See id.* at 120. The court in *Hilton* emphasized the complex factual nature of estimating the prospective injury under those circumstances, noting that "[w]hether the ponding of water in a given locality is or is not reasonably certain to cause the adjoining lands to become unhealthful as a place to live depends upon many and varied facts and circumstances.... in some cases it does, and in others it does not." *Id.* at 122 (quoting *Lockhart Power Co. v. Askew,* 110 S.C. 449, 96 S.E. 685, 687 (1918)).

In this case, by contrast, plaintiffs faced a slow, methodical—but unmistakably progressive—erosion of their banks. As plaintiffs' own expert witness, Christopher P. Jones, concluded, using plaintiff H.C. Ward's property as an example: "Using field survey and sediment data for the region, engineering calculations show the top of the bank can be expected to erode an additional 120 feet, or more, before any chance of natural stabilization will occur." *Bank Erosion Study* at 37. While the precise rate of erosion may have been unclear to plaintiffs themselves, there should have been no doubt that erosion was occurring. Further, there was no question as to the severity or permanence of damage that the affected land would suffer, as there was in *Hilton,* for here plaintiffs were losing their land altogether as it fell into the Waterway.

Plaintiffs' continuing claim argument also invokes the *Hilton* court's statement that continuing claims arise when the cause of an injury to land is "abatable." 254 F.2d at 122. However, contrary to plaintiffs' assertion—and defendant's concession—that the erosion in this case is abatable, the possibility that erosion's effects might be mitigated through bank protection does not mean that the cause of plaintiffs' injury is "abatable" under *Hilton.* This conclusion is inescapable in light of the continuing claim doctrine's purpose, which is to prevent "a statute of limitations from shielding an offender in an *on-going* wrongdoing." *Hatter v. United States,* 38 Fed.Cl. 166, 180 (1997) (emphasis added). If a cause of injury is abatable, then it is within defendant's control to stop it; under those circumstances, a defendant's decision to allow the injurious force to continue should, and does, give rise to a perpetually renewing cause of action. In *Hilton,* by contrast, the cause of the injury was the dam, which the court labeled "a permanent, nonabatable cause." *Id.* at 122–23. This recognition flows logically from the nature of the mechanisms involved—*i.e.,* once the dam was constructed, the flooding was not a matter within the Government's discretion, but rather was an unavoidable consequence of the dam's operation.

Likewise, in this case, the construction of the Waterway itself set in motion the erosive forces that eventually resulted in the taking

of plaintiffs' land.' Unless defendant were to somehow stop all wave action—whether caused by tides, wind, or boats—the erosion process would continue to affect properties along the Waterway. The fact that plaintiffs could protect their banks with revetments may mean that the *effects* of the erosion are abatable, but it does not render the *cause* abatable. In *Hilton,* the plaintiff could conceivably have constructed a dike to restrain the creek from overflowing his land. Further, in this vein, practically every erosion or flooding case involves damage that theoretically could have been prevented through proper structural protections. To hold that the possibility of bank protection gives rise to a continuing claim would mean that the statute of limitations would almost never cut off the claim of a plaintiff who had suffered a physical taking. With its statement regarding abatement, the court in *Hilton* was not aiming to revolutionize the law of takings; rather, it was merely recognizing that, when the Government has ongoing power and discretion to put an end to the cause of an injury to land, each decision not to do so becomes the infliction of a new injury that rightly gives rise to a new cause of action.

Plaintiffs have failed to convince the court that their claims' accrual should be postponed, that the statute of limitations should be tolled for any meaningful period of time, or that, under the continuing claim doctrine as developed through existing case law, they are entitled to recover for damage occurring within the six years previous to suit. What the court's analysis up to this point has not addressed is a more fundamental question, one which posed the greatest obstacle to the court's resolution of this case. It stems from defendant's argument that a plaintiff's takings claim accrued as to his or her entire parcel of property as soon as the erosion crossed the easement, despite the fact that the erosion, at that point, would have affected mere inches of their property.

As defendant conceded at oral argument, no tangible interest in the uneroded property—such as title—passed to the Government at the time the erosion crossed the easement. "The usual rule," as formulated by the Supreme Court, "is that if the United States has entered into possession of the property prior to the acquisition of title, it is the former event which constitutes the act of taking." *United States v. Dow,* 357 U.S. 17, 22, 78 S.Ct. 1039, 1044, 2 L.Ed.2d 1109 (1958). Here, however, defendant had entered into physical possession of only a small portion of plaintiffs' land at the time of accrual. Yet, once six years passed from the moment of encroachment, the landowner would be foreclosed forever from recovery for any land to be eroded—even land presently untouched by the erosion process. In other words, the question presents itself, how can a landowner lose his or her right to sue for a taking of land when that land has not yet been taken?

To begin to answer this question, it must be understood that the "proper focus, for statute of limitations purposes, 'is upon the time of the [defendant's] acts, not upon the time at which the consequences of the acts became most painful.'" *Fallini v. United States,* 56 F.3d 1378, 1383 (Fed.Cir.1995) (quoting *Delaware State College v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980)). According to the Supreme Court, "[p]roperty is taken in the constitutional sense when inroads are made upon an owner's use of it to an extent that, as between private parties, a servitude has been acquired either by agreement or in course of time." *United States v. Dickinson,* 331 U.S. 745, 748, 67 S.Ct. 1382, 1385, 91 L.Ed. 1789 (1947). It is tempting to conceptually subdivide a given landowner's property into minute units of land, the erosion of each giving rise to a separately accruing cause of action. A landowner would thereby be entitled to recover for any losses suffered in the six years previous to the filing of suit. As it stands, however, with a single point of accrual for the entire parcel, once any portion of the property is lost to erosion and the statute of limitations runs with respect to it, the Government essentially acquires a right to erode the balance of the landowner's property. Separately accruing causes of action would lend a degree of theoretical sensibility to this aspect of takings law, as the landowner would be entitled to postpone suit for a taking of his or her property until the Government actually took the particular property

in question. The court has concluded, however, that the attractiveness of such an approach is starkly outweighed by the chaotic takings regime to which it would lead.

If a landowner could, as a general proposition, recover for the loss of land suffered within the six years prior to suit, the statute of limitations would be rendered nearly meaningless in the erosion context, where losses occur gradually, over periods of time far greater than six years. Despite the fact that damages could be recovered for only that immediate six-year period, the liability inquiry would center on past events involving years far removed from those in suit. For example, if the taking of each piece of land gave rise to a separate cause of action, nothing would prevent a landowner from seeking damages for losses less than six years old, even if the waterway causing the erosion was constructed 200 years ago, and even if, many years before filing suit, the landowner could have forecast accurately the future rate of erosion. Such a potentiality is exactly what the statute of limitations is designed to avoid:

> Statutes of limitation ... in their conclusive effects are designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them.

*Order of Railroad Telegraphers v. Railway Express Agency*, 321 U.S. 342, 348–49, 64 S.Ct. 582, 586, 88 L.Ed. 788 (1944).

There is no way to translate plaintiffs' position—that they should be allowed to recover for damages to their land occurring within the six years prior to suit—into a workable rule that would maintain the practical discipline instilled into takings litigation by the statute of limitations. At oral argument, plaintiffs sought to limit the applicability of their position by emphasizing the uniqueness of their circumstances: the difficulty in accurately fixing the moment at which the erosion crossed the easement; the allegedly shifting Corps policy regarding bank protection; and the uncertainty of the legal merits of their cause of action under *Ballam*. However, the parties' stipulation recognizes the validity of Dr. Kana's conclusions regarding the dates of encroachment; there has been no showing that, prior to suit, plaintiffs were aware of any Corps policy regarding bank protection; and the tolling effect of *Ballam* is so limited in duration as to be irrelevant. Taken separately, then, these factors are insufficient to affect the court's statute of limitations inquiry; taken together, they do not merit the court carving out a new and potentially dangerous exception to the timeliness requirements of takings law.

Here, because no taking of property had yet occurred at the time of defendant's acts—*i.e.*, construction of the Waterway—plaintiffs' claims did not accrue until the erosion crossed onto plaintiffs' property. *See Ballam v. United States*, 806 F.2d 1017, 1023 (Fed.Cir.1986) ("[A]nticipation that land in future will wash away if nothing is done is not accrual."). But once that initial taking manifested itself on a particular plaintiff's land, all of that plaintiff's claims for erosion losses stemming from defendant's construction of the Waterway accrued simultaneously—whether those losses had already occurred or merely could be forecast to occur. While conceptually troubling to the court, this is the only acceptable outcome in a takings regime that must maintain a sense of order and finality:

> Statutes of limitation find their justification in necessity and convenience rather than in logic. They represent expedients, rather than principles. They are practical and pragmatic devices to spare the courts from litigation of stale claims, and the citizen from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost. ... They are by definition arbitrary, and their operation does not discriminate between the just and the unjust claim, or the voidable and unavoidable delay.

*Chase Securities Corp. v. Donaldson*, 325 U.S. 304, 314, 65 S.Ct. 1137, 1142, 89 L.Ed. 1628 (1945) (citation omitted).

Accordingly, the court holds that those plaintiffs whose land suffered encroachment by erosion more than six years before bringing suit in this court are time-barred from recovery, and their claims must be dismissed.

## III.

*Cost of Bank Protection as a Property Right*

■ Given the court's disposition of defendant's motions to dismiss, there remain eight claims by plaintiffs over which this court has jurisdiction. These claims are now subject to defendant's motion for summary judgment [7]—more properly termed a motion for partial summary judgment—based on defendant's contention that plaintiffs, as a matter of law, have no Fifth Amendment property right to bank protection at the expense of defendant.

In plaintiffs' amended complaint, they seek "actual damages by way of just compensation for a taking under the Fifth Amendment to the United States Constitution," as well as "actual damages measured by the reasonable costs of revetments or other erosion control structures to prevent further erosion of plaintiffs' property." It is this second element of damages which is the subject of defendant's summary judgment motion.

Under U.S.C.F.C. Rule 56(c), summary judgment is appropriate if the filings show that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Here, defendant argues that "the facts and circumstances surrounding the subject claims for bank protection bear a virtually identical resemblance to those present in the Federal Circuit decision in *Ballam v. United States*, 806 F.2d 1017 (Fed.Cir.1986)," and that the court in that case "concluded that Ballam did not have a property right to have suitable revetments constructed at public expense to protect her land." Because, according to defendant, an analysis of plaintiffs' claim of a right to the cost of revetments would hinge on the interpretation of the easement grant document—an issue of law determined by

the court in *Ballam*—"no evidence could be adduced at trial that would be of any aid in determining this claim."

The Federal Circuit in *Ballam* reasoned that, "[i]f Mrs. Ballam has a property right to shift such costs [of revetments to the Government], it must result from the language of [the easement grant]." 806 F.2d at 1021. The court agreed with the Fourth Circuit's earlier finding that the grant said nothing expressly on the subject, but that there was a strong implication that "the rights and duties between the government and adjacent landowners who granted easements for artificial parts of the waterway, should be the same as those that existed along natural parts of the waterway." *Id.* Based on this implication, the court went on note that "[i]t hardly is pretended that the government would be responsible to landowners on natural navigable water for erosion caused by public works which do not themselves impinge on such upland but only cause water to do so by waves or currents." As a result, the court accepted the Government's contention that "it has a right to open the [Waterway] to navigation without incurring any liability for measures thereby made necessary to prevent erosion." *Id.* at 1022.

Plaintiffs respond to defendant's argument by focusing on *Owen v. United States*, 851 F.2d 1404 (Fed.Cir.1988), which overruled *Ballam* to the extent that *Ballam* allowed "the navigational servitude to reach fast land above and outside the bed of navigable water." *Id.* at 1416. Plaintiffs assert that "*Owen* overturned *Ballam* fundamentally, both as to the earlier case's findings of fact and rulings of law." Rather than following the approach of *Ballam*, as defendant suggests, plaintiffs argue that, under *Owen*, the court should look to the approach of *United States v. Dickinson*, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947). According to *Owen*, "*Dickinson* instructs that the cost of revetments necessary to protect land outside the easement be borne by the government." *Owen*, 851 F.2d at 1415. In addressing the measure of damages, the *Dickinson* Court

---

7. Defendant's second motion for summary judgment—filed against plaintiff Loy Ree Ballam (Case No. 94–155L) and based on the doctrine of

res judicata—is now moot given that plaintiff Ballam's suit is to be dismissed under the statute of limitations.

had ruled that "[i]f the resulting erosion which, as a practical matter, constituted part of the taking was in fact preventable by prudent measures, the cost of that prevention is a proper basis for determining the damage." 331 U.S. at 751, 67 S.Ct. at 1386.

The court agrees with plaintiffs that, in the wake of *Owen*, the approach taken by the *Dickinson* Court is much more helpful than the approach of the court in *Ballam*. *See Owen*, 851 F.2d at 1414 ("Regrettably, the relevance of *Dickinson* to the situation in *Ballam* went unrecognized by this court."). The court adopts the *Ballam* court's finding regarding the content of that plaintiff's easement grant, *see* 806 F.2d at 1021, and presumes that the easement grants for the tracts related to these lawsuits are similar in content to the one examined in *Ballam*. Beyond that factual finding, however, the reasoning of *Owen* so eviscerated the core of *Ballam*'s analysis that, while portions of the opinion may technically remain valid law, its underlying analysis is of dubious pertinence to these cases.

Even so, defendant is correct in asserting that plaintiffs do not have an independent right to compensation for the cost of bank protection. As expressed in *Dickinson*, 331 U.S. at 751, 67 S.Ct. at 1386, and by the trial court in *Ballam*, 552 F.Supp. 390, 393 (D.S.C. 1982) (awarding plaintiff "the cost of protecting her land from future erosion"), the award of such costs is merely a method by which damages may be measured—*i.e.*, an alternative to holding the Government liable for the value of all land to be lost in the future. If revetments are less expensive than the value of the land forecast to be lost, then the Government may discharge its liability by bearing the cost of bank protection; if the value of land to be lost is less than the cost of revetments, however, plaintiffs cannot force the Government to pay the higher amount. Plaintiffs do not have a right to revetments *per se*. Accordingly, the court will grant defendant's motion for partial summary judgment. This determination does not preclude plaintiffs, in the end, from recovering the cost of revetments as damages; it merely signifies that they aren't entitled to such an award as a separate property right.

## Conclusion

1. The court holds that plaintiffs' complaints contain allegations giving rise to potentially valid takings claims, and thus denies defendant's motion to dismiss for lack of subject-matter jurisdiction, filed February 16, 1995.

2. The court holds that the claims related to nineteen of the properties are barred by the statute of limitations; the clerk is hereby instructed to dismiss the following cases for lack of timeliness: No. 94–140L; No. 94–141L; No. 94–143L; No. 94–144L; No. 94–145L; No. 94–146L; No. 94–147L; No. 94–149L; No. 94–150L; No. 94–152L (consolidated with 93–84L); No. 94–153L; No. 94–154L; No. 94–155L (but only as to Tract 1); No. 94–156L; No. 94–160L; No. 94–163L; and No. 94–164L.

3. The clerk is also instructed to dismiss the following cases without prejudice, as the properties to which they relate have not yet suffered erosion: No. 94–151L; No. 94–157L; and No. 94–162.

4. Further, the court holds that plaintiffs do not have a separate property right to compensation for the costs of bank protection, and thus grants defendant's "motion for [partial] summary judgment" addressing the right to bank protection, filed July 15, 1994.

5. Finally, the court denies as moot defendant's "motion for summary judgment" based on the doctrine of res judicata, filed June 16, 1994.

No costs are awarded.