**KINGSPORT HORIZONTAL PROPERTY REGIME** and **Kingsport Homeowners Association, Inc., et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

Nos. 94–145L, 94–140L, 94–144L, 94–149L, 94–153L, 94–155L, 94–156L, 94–160L, 94–163L, 94–164L, 98–861L, 98–862L, 98–863L, 98–864L, 98–865L.

United States Court of Federal Claims.

Sept. 3, 2002.

Thornwell F. Sowell, Sowell, Todd, Laffitte, Beard & Watson, L.L.C., Columbia, South Carolina, with whom was H.F. Bell, Chesterfield, South Carolina, for plaintiffs.

Alan Brenner, Department of Justice, Washington, D.C., for defendant.

### DECISION ON REMAND

WIESE, Judge.

This decision follows an order of remand issued by the Federal Circuit in *Boling v. United States*, 220 F.3d 1365 (Fed.Cir.2000). In that decision, the Court of Appeals for the Federal Circuit set forth the standard for determining the date of accrual for claims arising from on-going erosion damage to private property located on a government-constructed waterway. This court was in turn charged with making the factual determinations necessary for the application of that standard.

After reviewing the transcript and the accompanying exhibits from the trial held in this action in May 1998, we conclude that all but three of the claims in question are out of time under the Federal Circuit's standard and therefore must be dismissed. The remaining claims, specifically Natalie Flowers Edge, Tract 2 (94–153L), L.J. Bell and J.B. Johnson as Personal Representatives of the Estate of C.H. Permenter, Jr. and Louise L.

Permenter (94–156L), and Hope Willard (94–164L), shall be reinstated.

### I.

Plaintiffs, landowners of properties located on the Atlantic Intracoastal Waterway in Horry County, South Carolina, first brought suit in this court on February 16 and November 30, 1993,[1] for the taking of their property as a result of bank erosion on the government-constructed waterway. The government moved to dismiss plaintiffs' claims on the ground that they had accrued more than six years before their filing dates and thus were barred by this court's statute of limitations. 28 U.S.C § 2501 (2000). Ultimately, the court conducted a trial to address the question of timeliness and thereafter issued an opinion on August 27, 1998, dismissing as out of time 16 of the claims then before it. *Boling v. United States*, 41 Fed.Cl. 674 (1998), *vacated by* 220 F.3d 1365 (Fed.Cir. 2000).

On appeal, the Federal Circuit rejected the proposition that a claim accrues, for statute of limitations purposes, at the moment erosion crosses the government easement line. Instead, the court identified the date of accrual as the point when "the environmental damage has made such substantial inroads into the property that the permanent nature of the taking is evident and the extent of the damage is foreseeable." *Boling*, 220 F.3d at 1372. The court explained its reasoning as follows:

> Given the realities of the terrain and the difficulty of determining the exact boundary of the easement, it was virtually impossible for the landowner to discern that land had been taken when the degree of encroachment was only "mere inches." At the time only a small portion of the land had suffered erosion damage, the permanent nature of the taking was not yet evident, thereby precluding a finding of claim stabilization. However, as the ero-

---

1. While the cases bear a 1994 docket date, the four original plaintiffs—W. Frank Boling, W.E. Gore, Jr., George Rayford Vereen, and Hope Willard—filed suit on February 16, 1993, with the remaining plaintiffs filing suit on November 30, 1993. In an order dated February 17, 1994, this court directed each plaintiff to file an individual complaint to stand in place of the then-pending multi-party complaints, but specified that each complaint would retain the 1993 filing date.

sion damage progressed and made a substantial encroachment of the parcel, the uncertainties must give way to the unmistakable fact that land had been eroded. *Id.* (citation omitted).

The court went on to note that "[t]he point at which the erosion damage transitions from 'mere inches' to substantial encroachment is not amenable to precise definition, and will vary from parcel to parcel. However, as guidance in making this determination the fact-finder should take into account the uncertainties of the terrain, the difficulty in determining the location of the government's easement, and the irregular progress of erosion." *Id.* at 1373 (citation omitted).

■ Considering the claims at issue in light of that standard, we hold that all but three of the properties had suffered a sufficient level of erosion by 1987 (the earliest date for a claim to have accrued and still be timely) to alert the landowners to the permanent and recurring nature of the damage. Those claims were thus properly dismissed in this court's prior decision. As to the remaining three properties, however, we cannot conclude with confidence that substantial encroachment had occurred as of 1987, and therefore are unable to dismiss those claims as out of time.

In reaching these conclusions, we begin with the data presented at trial by the government's expert, Dr. Timothy W. Kana. Relying on a 1994 ground truth survey commissioned by the Army Corps of Engineers, Dr. Kana first determined the location of the various properties' banks as of 1994. Dr. Kana next graphed a series of aerial photographs taken over an approximately fifty-year span and from the graphs established a trend line, *i.e.,* the erosion rate that was typical for a particular property. By comparing the magnitude of erosion evident on the 1994 ground truth survey with the erosion rates derived from the graphs, Dr. Kana was then able to assess whether the damage was likely to have occurred during the previous six years or whether it was too extensive to have happened entirely within that period,

thus making it likely that encroachment of the property had occurred prior to 1988.[2] Dr. Kana additionally testified at trial that he had not simply used the rates contained in the graphs, but had also factored in a margin of error of two, three, or four times the erosion rate to account for the possibility of accelerated erosion or inaccuracies in the aerial photographs.

Employing this methodology, Dr. Kana divided the properties into three categories: those encroached prior to 1988, those encroached between 1988 and 1994, and those not yet encroached as of the date of suit. Despite the apparent precision of those categories, however, we made no attempt in our original opinion to identify a specific date of crossing. That was the case because we recognized the very problem the Federal Circuit identified—namely, the difficulty in recognizing mere inches of encroachment when the process of erosion was occurring gradually over difficult-to-access terrain. In order to account for those factors, we dismissed only those properties that evidenced, as of 1994, at least 40 feet of erosion over at least ten percent of the property. In those instances, we concluded, the erosion rates experienced at the properties led to the inevitable conclusion that the land had been encroached well before the cut-off date.

Implicit in that finding was the fact that a property with such significant encroachment as of 1994 would by definition have evidenced substantial encroachment (on the order of 10 to 20 feet) as early as 1987. As a result, many of our previous findings remain unaffected by the Federal Circuit's ruling (a possibility that the court allowed for when it noted that "it may be little more than a pro forma exercise to determine that such a parcel was substantially encroached long before the filing date," *Boling,* 220 F.3d at 1373). Even in those instances where the easement line was difficult to ascertain (either for want of Corps monuments marking the line or dense brush obscuring it), we believe that 10 feet of erosion is sufficient to alert the reasonably diligent landowner (as all property

2. Although Dr. Kana incorrectly used 1988 rather than 1987 as the relevant date for testing the timeliness of the claims, we found the discrepancy insignificant for reasons cited in our earlier opinion. *Boling,* 41 Fed.Cl. at 681. That determination was not challenged on appeal.

owners are expected to be) of the existence and enduring nature of the erosion affecting his property. This is particularly the case where, as here, the landowner could have observed a steady process of erosion since the canal's construction in 1939, resulting in the washing away of more than 40 feet of land on the canal side of the easement line.

Turning then to the individual properties, we note that the rates of erosion calculated by Dr. Kana were, in general, less than 2 feet per year.[3] By contrast, the damage to the properties evident on the 1994 ground truth survey in many cases was vast: 58 feet in the case of Beachwood Golf Corporation (94–144L); approximately 80 feet as to Tract 1 and 30 to 66 feet as to Tract 3 of the Natalie Flowers Edge property (94–153L); 50 feet across most of the property of Herbert Cecil Ward (94–160L); and almost 50 feet in the case of George Rayford Vereen (94–163L). Those facts, taken together, require us to conclude that these claims were properly dismissed in the court's prior decision. In the case of the three remaining properties, however, our original findings require adjustment, specifically as to the claims filed by Natalie Flowers Edge, Tract 2 (94–153L), the Estate of C.H. Permenter, Jr. (94–156L), and Hope Willard (94–164L). In these three instances, we believe, the erosion had not sufficiently encroached the property nor affected a significant enough portion of the shoreline to put the owners on notice in 1987 of a permanent, on-going injury.

*Beachwood Golf Corporation, 94–144L*

As plaintiffs note, Dr. Kana initially characterized the Beachwood property as falling within category three, property encroached after 1994. He explained that potential inaccuracies in the ground truth survey had originally caused him to rely more heavily on the location of the banks as shown in the aerial photographs. When a January 1996 survey confirmed the accuracy of the ground truth

survey, however, Dr. Kana recharacterized the property as having been encroached prior to 1988, based both on the 50 to 60 feet of encroachment evident in the surveys and on the "relatively low rate of erosion" (on the order of 1.15 feet per year) established from the aerial photographs.

Even assuming an erosion rate many times greater than that found in evidence, 50 to 60 feet of encroachment across an entire property translates into substantial encroachment (again on the order of 15 to 20 feet across the length of the property) as of 1987. Accordingly, we find the Beachwood claim to be time-barred.

*Natalie Flowers Edge, 94–153L*

According to the 1994 ground truth survey, Tract 1 of the Natalie Flowers Edge property had suffered erosion varying from 20 feet at the downstream end of the property to 73 feet at its midpoint, with 60 feet of erosion evident at the upstream end. The damage to Tract 2, by contrast, ranged from 20 to 40 feet but, in the words of Lester Bodkin (the surveyor who conducted the 1994 ground truth survey), was "predominantly" on the order of 25 feet. Finally, Tract 3 evidenced a maximum of 30 to 65 feet of erosion, with only minimal encroachment (approximately 8 feet) on the downstream end of the property.

Of the three tracts, we find that only the claim pertaining to the second was timely filed. As to Tract 1, the property had experienced significant erosion (on the order of 60 to 70 feet) over most of its length by 1994. Although erosion rates for the period 1989 to 1993 seemed to increase slightly above the long-term rate of 1.07 feet per year calculated by Dr. Kana, we would nevertheless have expected upwards of 40 feet of erosion already to have been evident by 1987. While we recognize that Tract 1 fell on the side of the waterway identified by a government

---

**3.** We recognize that plaintiffs have challenged Dr. Kana's use of long-term erosion rates, *i.e.*, rates averaged over the period 1939 to 1993, rather than the arguably higher, short-term rates of later years. Dr. Kana himself testified, however, that he employed rates two, three, and even four times the long-term rate to account for the possibility of accelerated erosion. Additionally, in those instances where the data seemed to suggest higher rates of erosion with regard to even a single point on the shore (likely denoting a single episodic erosion), we were willing to apply that rate to the shoreline as a whole, thereby creating a margin of error dramatically in favor of plaintiffs. Keeping the Federal Circuit's directives in mind, we dismissed only those cases whose encroachment by 1987 was both substantial and without question.

witness as a "no-man's land," we believe that 40 feet of erosion is sufficient to put a prudent landowner on notice that the nature of the taking is permanent and that subsequent damage is foreseeable.

The same is true for Tract 3. By 1994, more than half of the property showed damage of approximately 30 feet, with a washed-out area of 65 feet. Even assuming a short-term erosion rate of 2.5 feet per year (substantially higher than the long-term rate of 1.17 feet per year provided by Dr. Kana), the claim certainly would have accrued before 1987, when anywhere from 15 to 45 feet of erosion would have been apparent.

With regard to Tract 2, however, the same cannot be said. With an average of only 25 feet of erosion as of 1994 and a short-term erosion rate in some instances of greater than 2.5 feet per year, the damage to the property, if any, would not have been sufficient by 1987 to put the landowner on notice either that an injury had occurred or that the situation had stabilized. Accordingly, we find claim 94–153L with respect to Tract 2 to be timely filed.

*L.J. Bell and J.B. Johnson as Personal Representatives of the Estate of C.H. Permenter, Jr. and Louise L. Permenter, 94–156L*

We reach a similar conclusion with respect to the Permenter property. A March 1996 private survey, conducted nine years after the earliest timely accrual date, reveals only 35 feet of encroachment. Given short-term erosion rates sometimes two and three times the magnitude of the sustained long-term erosion rate (1.42 feet per year), it seems unlikely that the erosion as of November 1987 would have been significant enough to satisfy the Federal Circuit's substantial encroachment test. We thus deem claim 94–156L timely filed.

*Herbert Cecil Ward, 94–160L*

According to the Corps of Engineers' ground truth survey, the Ward property had been encroached by 50 feet along most of its shoreline as of 1994; a survey in 1993 set the level of encroachment at as much as 60 feet. In his testimony, Dr. Kana acknowledged that the property had experienced an accelerated erosion rate in recent years of some

3.32 feet per year. Even at that increased rate, however, we still would have expected to see 27 feet of erosion by November 1987 (the earliest date for the claim to have accrued and still be timely). And as with the other significantly eroded properties located on the "no-man's land" portion of the waterway, a landowner is charged with using reasonably diligent means of both ascertaining and monitoring the bounds of his property. Undoubtedly, 27 feet of erosion is sufficient to alert a landowner of even moderate vigilance of the accrual of his claim. We therefore find claim 94–160L to be time-barred.

*George Rayford Vereen, 94–163L*

George Rayford Vereen originally filed suit on February 16, 1993. A private survey conducted in 1992 showed encroachment of 30 feet on the west end of the property and 40 to 45 feet on the east end. The ground truth survey in 1994 recorded some 50 feet of erosion. Dr. Kana calculated the long-term average erosion rate for the property as 1.45 feet per year. A review of short-term rates for the period 1989 to 1993 does not reveal a markedly accelerated level of erosion. We therefore conclude that the property had been substantially encroached, well in excess of 25 feet, as of February 1993 and, thus, the claim is time-barred.

*Hope Willard, 94–164L*

Hope Willard originally filed suit on February 16, 1993. Included in the trial evidence were a privately commissioned 1992 ground survey and the 1994 ground truth survey conducted by the Corps of Engineers. The 1992 survey recorded a maximum encroachment over the easement line of 57 feet; the 1994 survey recorded a maximum encroachment of 77 feet. Dr. Kana testified that while the maximum erosion was on the order of 77 feet—a point he described as a "blip"—the encroachment was on average 40 feet from one end of the property to the other.

We originally dismissed this claim based on both the 77 feet of encroachment and the relatively low long-term erosion rate of 1.1 feet per year, but several factors now cause us to reconsider. First, we no longer are convinced that the standard employed by Dr. Kana—that the erosion must have affected at

least 10 percent of the shoreline to register as encroachment—is sufficient to satisfy the Federal Circuit's definition for substantial inroads. We are thus required to look not at the aberrant 70 feet of erosion, but instead at the 40 feet of encroachment that marks the majority of the property. Second, we note that the earlier filing of Mr. Willard's claim combined with the confusion of filing dates in Dr. Kana's report essentially extends the relevant period from six to just under eight years in assessing the extent of the erosion (from February 1987 to November 1994)—an addition that becomes particularly significant in years of accelerated erosion rates. Finally, Dr. Kana's data suggests that the property indeed experienced significantly higher erosion rates in the years 1989 to 1993. Taken together, those factors prevent us from concluding that 40 feet of erosion could not have occurred within that 7.75 year time-frame. As a result, we cannot conclude that the property had suffered substantial encroachment as of 1987 and therefore must deem the claim timely filed.

## II.

■ As recounted in our earlier opinion in this case, a suit seeking just compensation for land taken by erosion was first filed by Loy Ree B. Ballam in the United States District Court for the District of South Carolina in 1982. That suit, which resulted in a judgment for plaintiff, was subsequently reversed on appeal. The Court of Appeals for the Federal Circuit ruled that plaintiff "had no property right to be safeguarded by the Army Engineers against collateral consequences of navigation improvements." *Ballam v. United States*, 806 F.2d 1017, 1022 (Fed.Cir.1986), *cert. denied*, 481 U.S. 1014, 107 S.Ct. 1889, 95 L.Ed.2d 496 (1987). Two years later, however, the court of appeals changed course. In an *en banc* decision in *Owen v. United States*, 851 F.2d 1404 (Fed. Cir.1988), the court decided that notwithstanding the government's dominant navigational servitude, the government was liable for the erosion-caused loss to private property occurring outside the high-water boundaries of a navigable waterway. *Id.* at 1412. As to its earlier decision in *Ballam*, the court specifically noted that "the error … in *Bal-*

*lam* was the failure to recognize the existence of horizontal limits to both easements and navigational servitudes, beyond which government-caused erosion results in a taking under the Fifth Amendment." *Id.* at 1415 n. 12.

On the basis of this change in law, Mrs. Ballam filed a second taking claim in this court in November 1993 (94–140L). Defendant moved for dismissal of the claim on the ground that it was barred by the court's six-year statute of limitations. Alternatively, defendant contended that res judicata barred relitigation of the claim. We ruled that Mrs. Ballam's claim, like those of several other plaintiffs then before the court, was barred by the statute of limitations because the events giving rise to the claim (wave-caused erosion that had crossed over the easement line) had occurred more than six years prior to the commencement of suit.

Mrs. Ballam now asks that we reconsider this ruling. She argues that the timeliness of the claim should be measured from the date that a legal remedy for the injury complained of first became available, *i.e.*, after the issuance of the *Owen* decision in July 1988, rather than from the date the causative events took place, *i.e.*, the crossing of the easement line in the latter part of 1975. In effect, the contention is that a statute of limitations can have meaning only in the context of a claim for which the law provides a remedy.

The argument, while appealing, is one we cannot accept. This court's statute of limitations provides that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. The statute is jurisdictional, *Soriano v. United States*, 352 U.S. 270, 273, 77 S.Ct. 269, 1 L.Ed.2d 306 (1957), and must be read "with that conservatism which is appropriate in the case of a waiver of sovereign immunity." *United States v. Sherwood*, 312 U.S. 584, 590, 61 S.Ct. 767, 85 L.Ed. 1058 (1941). Consequently, "we cannot restructure [the statute] to satisfy our own ideas of what is right and just," *O'Callahan v. United States*, 196 Ct.Cl.

**562**

556, 451 F.2d 1390, 1394 (1971), but are bound to apply it in accordance with its literal text.

Proceeding from this orientation then, we conclude that the statute of limitations applies to every claim for monetary relief against the United States, including those claims for which a legal remedy may not have been available at the time the defining events first occurred. As our cases demonstrate, the statute of limitations is fact-driven. *See, e.g., O'Callahan,* 451 F.2d 1390 (rejecting the contention that a cause of action for military back pay could not accrue where the claim was not practically maintainable under prior law); *Cosmopolitan Mfg. Co. v. United States,* 156 Ct.Cl. 142, 297 F.2d 546 (1962) (ruling that the statute of limitations was not tolled on a contract claim whose enforcement became barred because of an intervening change in law).

�no Applying this standard to the claim before us requires us to deny the request for reconsideration. The claim Mrs. Ballam is asking us to re-examine involves the same facts that were litigated before the district court in South Carolina: namely, erosion that had crossed over the easement line by the end of 1975. Thus, even if we consider the statute of limitations to have been tolled during the five-year period the claim was in litigation (1982 to 1986), it remains the case that the reassertion of the claim in this court in 1993 comes well more than six years after the claim first accrued.

*Conclusion*

For the reasons set forth above, this court upholds its earlier dismissal of case numbers 94–140L, 94–144L, 94–153L (with respect to Tracts 1 and 3), 94–160L, and 94–163L. Also consistent with this opinion, the court concludes that case numbers 94–153L (with respect to Tract 2), 94–156L, and 94–164L shall be reinstated under the lead case *Kingsport Horizontal Property Regime v. United States,* No. 94–145L.